NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0087n.06

No. 12-1268

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
***Jan 24, 2013***
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHERYL MINOR, | ) | |
| | ) | |
| Plaintiff – Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | OPINION |
| Defendant – Appellee. | ) | |
| | ) | |

Before: SILER, GRIFFIN, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Cheryl Minor appeals the district court's Opinion and Order affirming the decision of the Commissioner of Social Security to deny her disability benefits. Substantial evidence in the record as a whole establishes that Minor is disabled by multiple physical and mental impairments. Because the Commissioner's decision rejecting Minor's application is flawed in several respects, we REVERSE and REMAND for an award of benefits.

## I. PROCEDURAL HISTORY

Minor filed an application for disability benefits in April 2007 alleging total disability beginning May 4, 2005, the day she was involved in a serious motor vehicle accident. When the application was filed, she was 41 years of age with a high school diploma and two years of college. She had worked approximately eighteen years as an operations supervisor for the city bus service in Kalamazoo, Michigan.

1

After the application for benefits was initially denied, an Administrative Law Judge (ALJ) held a hearing in November 2009. Minor was represented by counsel and testified at the hearing. At the ALJ's request, James Lozer, a vocational expert, also testified. In December 2009, the ALJ issued a decision denying Minor's application for benefits at the fifth step of the disability analysis. He found that Minor could not return to her prior work, but based on her age, education, work experience, and residual functional capacity, she could still perform a limited range of light work that is available in the national and regional economy. The Appeals Council denied Minor's request for review, and the district court affirmed.

Minor now seeks review in this court, contending that the ALJ ignored objective medical evidence of her disabilities and failed to accord the opinions of her treating physicians controlling weight. She also argues that the ALJ failed to credit her subjective complaints of pain, along with mental and emotional impairments that affect her perception of pain. The Commissioner urges affirmance. The following recitation of facts, although lengthy, captures the salient aspects of the voluminous administrative record.

## II. FACTS

Minor has a history of migraine headaches since the age of nine. For at least twenty years, she received medical treatment at Westside Family Medical Center, P.C., in Kalamazoo. Several primary care physicians prescribed numerous medications to treat Minor's migraine headaches. When the medications stopped providing relief, the doctors started giving her intramuscular injections of Demerol and Phenergan.[1] In addition to regular clinic visits, Minor was treated for

---

[1]Demerol is an opioid analgesic given for relief of moderate to severe pain. *See* Demerol, available at www.pdr.net/drugpages/concisemonograph.aspx?concise+2136 (last visited Dec. 31, 2012). Phenergan is used to control nausea and is given as an adjunct to analgesics for control of

migraine headache pain in a hospital emergency room six or seven times a year so that she could continue to work. An MRI examination of the brain on June 27, 2003, was normal.

Dr. Targowski, one of the treating physicians, referred Minor to Dr. Gary Ruoff within the same clinic for a consultation concerning migraine headaches. Minor reported to Dr. Ruoff on January 4, 2005 that her migraine headaches occurred several times a month, each lasting a period of days. She described the pain as severe, throbbing, and pulsating, accompanied by nausea and vomiting, blurred vision, spots before her eyes, and sensitivity to light, sound, and odor. She also reported a stiff and tender neck, difficulty concentrating, and a history of depression, anxiety, irritability, and fatigue. Dr. Ruoff noted that Minor had a history of irritable bowel syndrome (IBS) and anemia. She denied recurrent pains or backaches, pain or swelling of joints, or muscle spasms. Minor was taking nine prescribed medications for pain, sleep, depression, anxiety, high cholesterol, high blood pressure, nausea, and stomach upset.

On physical examination, Minor was alert and in no acute distress with a full range of motion. A neurological exam was normal. Dr. Ruoff reported that a Midas questionnaire was positive for moderate to severe disability from headaches, the HIT test was positive for moderate to severe disability from headaches, and the Zung depression test was positive for moderate depression. Dr. Ruoff's impression included, among other things, migraine headaches, chronic daily headaches secondary to migraine, depression, IBS, temporomandibular joint disorder (TMJ), and cardiac

pain. *See* Phenergan, available at www.pdr.net/drugpages/concisemonograph.aspx?concise+1579 (last visited Dec. 31, 2012).

3

arrhythmia. In addition to educating and instructing Minor on ways to try to avoid migraine headaches, Dr. Ruoff prescribed Elavil and Topamax[2] in addition to the other medications.

An MRI examination of the cervical spine on April 13 was normal. Minor received Demerol injections for migraine headache pain in the primary care clinic on April 12, 19, and 21 and again on May 3. She was also seen in the hospital emergency room for a Demerol injection on May 2. It appears that Minor became physically dependent on the Demerol injections. For example, on April 19, when Dr. Brown offered Nubain[3] instead of Demerol, Minor insisted on a Demerol injection, which he gave her, along with Phenergan.

On May 4, Minor was involved in a serious motor vehicle accident while driving a city vehicle. She struck a truck broadside at 45 miles per hour. Although Minor was restrained by a seatbelt, the airbag deployed, striking her in the head and left shoulder and causing a momentary loss of consciousness. She was transported to the hospital by ambulance with spinal and cervical immobilization. In the emergency room, Minor complained of headache and pain in the upper and lower back, neck, and left shoulder. X-rays revealed no fractures, but they did show loss of normal curvature in the cervical spine, a change from the April 13 MRI which showed a normal cervical

---

[2]Elavil is a tricyclic antidepressant used to treat symptoms of depression. *See* Elavil, available at www.drugs.com/elavil.html (last visited Dec. 31, 2012). Topamax is a seizure medication used to treat migraine headaches in adults. *See* Topamax, available at www.drugs.com/topamax.html (last visited Dec. 31, 2012).

[3]Nubain is an analgesic used to treat moderate to severe pain. *See* Nubain, available at www.drugs.com/cdi/nubain.html (last visited Dec. 31, 2012).

spine. She was diagnosed with multiple contusions; treated with morphine, Ativan[4], and eye irrigation; and sent home with a prescription for pain medication.

Minor entered a downward spiral after the car accident. Complaining of constant pain in her head, neck, left shoulder, upper and lower back, and left leg, she visited the primary care clinic and hospital emergency rooms every few days seeking pain relief. The day after the accident, Minor was seen by both a primary care physician, Dr. Brown, and a worker's compensation doctor. Dr. Brown noted that Minor appeared to be in discomfort and was moaning, although he found the results of a physical examination to be unremarkable. He gave her injections of Demerol and Phenergan. When the worker's compensation physician walked into the exam room, Minor was lying in a fetal position with her eyes closed, holding her head and complaining of a headache. Her neck was tender in the bilateral paraspinal area and the bilateral greater occipital area.[5] She was also tender in the back, and cervical flexion caused pain over the entire length of her back. Her upper extremity strength was found to be "pretty much" normal and equal. He prescribed Norflex[6] and Orudis[7] and advised her to use ice and increase her activity as possible. He gave her an excuse from work.

---

[4]Ativan is a benzodiazepine used in the management of anxiety. *See* Ativan, available at www.pdr.net/drugpages/concisemonograph.aspx?concise+1548 (last visited Dec. 31, 2012).

[5]"Paraspinal" refers to muscles located adjacent to the spinal column. *See* paraspinal, available at www.merriam-webster.com/medical/paraspinal (last visited Dec. 31, 2012). "Occipital" refers to muscles at the back of the head or skull. *See* occiput, available at www.merriam-webster.com/dictionary/occiput (last visited Dec. 31, 2012).

[6]Norflex is a muscular analgesic given for the relief of discomfort associated with acute, painful musculoskeletal conditions. *See* Norflex, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=701 (last visited Dec. 31, 2012).

[7]Orudis is a nonsteroidal anti-inflammatory drug. *See* Orudis, www.drugs.com/cdi/orudis.html (last visited Dec. 31, 2012).

Minor asked for Demerol, but the doctor refused to give it and suggested that the drug might be causing her headaches.

Minor returned to Dr. Targowski at the primary care clinic on May 6. She exhibited tenderness and muscle pain, but a neurological examination was normal. She received Toradol[8] for pain.

On May 9 Minor visited the worker's compensation doctor again. She walked very slowly and wore a sling on her left arm. He described her as "moaning and groaning, complaining of neck pain, shoulder pain, back pain." AR 483. Minor told him she had gone to an intermediate care clinic where she received a cervical collar and the sling. Examination of the left shoulder revealed it was very tender to light touch. Minor was unable to move the shoulder without excruciating pain. Her cervical spine was also "very tender," with limited range of motion. The doctor prescribed medications and ordered physical therapy. He also ordered an MRI of the left shoulder and of the cervical and lumbar spine.

The MRI of the left shoulder taken on May 13 showed "tendinosis of the supraspinatus and infraspinatus tendons without full thickness tendon tear or tendon retraction." AR 480. The MRI of the lumbar spine showed mild degenerative changes at L3–L4, L4–L5, and L5–S1, with no compromise of the thecal sac or exiting nerve roots. The report indicated loss of signal with bulging disc at L5-S1, loss of signal with slight bulging disc at L4–L5, and slight loss of signal at L3–L4.

On May 12, 13, and 14, Minor returned to her primary care clinic. Complaining of a headache, she received injections of Demerol and Phenergan on May 12 and 13. On May 14, Dr.

---

[8] Toradol is a nonsteroidal anti-inflammatory drug. *See* Toradol, www.drugs.com/toradol.html (last visited Dec. 31, 2012).

6

Winkler refused to give Demerol because Minor had received three injections in nine days and additional injections would cause rebound headaches. He urged her to refill a Vicodin[9] prescription for pain.

On May 20, Minor returned to the worker's compensation doctor. Staff reported that Minor seemed fine when she arrived, although she also reported that she had visited the emergency room three times that week. When the doctor entered the exam room, Minor was slouched in a chair moaning and reported she was no better. When he asked how physical therapy was going, she stated she went once and then visited the emergency room. Minor complained of pain in the anterior shoulder area, with exquisite tenderness any place the doctor touched her in the left shoulder. Based on the MRI results and her persistent complaints of pain, he referred her to Dr. William Uggen, an orthopedic surgeon.

While waiting to see Dr. Uggen, Minor visited the emergency room twice for pain. On May 21 she complained of left shoulder pain and could not perform any range of motion. The physician gave her Dilaudid[10] and Phenergan, sent her home with a Vicodin prescription, and recommended continued physical therapy. On May 31, Minor was seen in the primary care clinic complaining of a headache. Dr. Woodhams wrote that she had been to the emergency room the night before and received a shot that was ineffective. Finding no reason to withhold Demerol, Dr. Woodhams gave the injection.

---

[9]Vicodin is an opioid analgesic prescribed for relief of moderate to moderately severe pain. *See* Vicodin, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=627 (last visited Dec. 31, 2012).

[10]Dilaudid is an opioid analgesic given to manage moderate to severe pain in opioid-tolerant patients who require higher doses of opioids. *See* Dilaudid, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=623 (last visited Dec. 31, 2012).

On June 7 Dr. Uggen injected Minor's left shoulder and acromioclavicular (AC) joint with Marcaine and Depo-Medrol.[11] On June 9 and 15, Minor went to her primary care clinic where she received injections of Stadol[12] and Phenergan. The physician noted Minor had "been here basically every week for injection of Demerol." AR 439. She was cautioned about rebound headaches and told to take Topamax and Elavil.

A similar pattern of treatment continued through June and into July, with Minor obtaining medical treatment from primary care physicians, Dr. Uggen, and emergency room physicians. Dr. Uggen allowed her to remain off work and referred her to a neurologist for her occipital headaches and spinal problems. He prescribed Flexeril, Vicodin, and Relafen,[13] and ordered continuation of pool therapy to work on left shoulder range of motion. Minor received injections of Stadol and Phenergan at the primary care clinic on June 21 and 30, and July 5. On July 3, 10, and 11, Minor went to the emergency room complaining of headache and back pain. Although her physical

---

[11]Marcaine is a local anesthetic. *See* Marcaine, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=3179 (last visited on Dec. 31, 2012). Depo-Medrol is a glucocorticoid used in steroid-responsive disorders. *See* Depo-Medrol (also known as methylprednisolone acetate), available at www.pdr.net/drugpages/concisemonograph.aspx?concise=1875 (last visited Dec. 31, 2012).

[12]Stadol is a synthetic opioid analgesic. *See* Stadol, available at www.drugs.com/pro/stadol.html (last visited Dec. 31, 2012).

[13]Flexeril is a skeletal muscle relaxant. *See* Flexeril, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=806 (last visited Dec. 31, 2012). Relafen is a non-steroidal anti-inflammatory drug. *See* Relafen, available at www.pdr.net/drugpages/medicationguide.aspx/mg=7855 (last visited Dec. 31, 2012).

examinations were unremarkable, she was injected with Stadol and Phenergan and given prescriptions for Vicodin and Valium.[14]

On July 15, Minor was examined by Dr. Michael Chafty, a board-certified anesthesiologist in the Pain Clinic at Kalamazoo Anesthesiology, P.C. Minor did not remove a sling from her left arm during the exam. She sat upright in no acute distress, with good range of motion of the cervical and lumbar spine, as well as the shoulders bilaterally. Her grip strength was strong and equal in the upper extremities. Straight-leg raising was negative bilaterally. Her gait was slow but not antalgic. Examination of the back showed a positive Waddell's sign with very light touch to the upper back.[15] Dr. Chafty assessed Minor with myofascial back pain. He told her it would take time to heal and narcotics were not recommended. He suggested lidocaine infusions and ordered continuation of physical therapy.

The same day, Minor saw Stephen Lazar, Ph.D., a licensed psychologist, as part of her initial evaluation at the pain clinic. Minor reported daily "unbearable" headaches, rating her pain at 10/10, that required her to seek medical treatment one to two times a week. She reported a history of

---

[14]Valium is a benzodiazepine used to manage anxiety symptoms. *See* Valium, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=1260 (last visited Dec. 31, 2012).

[15]"Waddell's signs" are the most well-known of several tests developed to detect non-organic causes of low back pain. Samuel D. Hodge, Jr. & Nicole Marie Saitta, *What Does It Mean When A Physician Reports That A Patient Exhibits Waddell's Signs?*, 16 Mich. St. Univ. J. Med. & L. 143, 155–56 (2012). "A positive Waddell's sign may indicate that the patient's pain has a psychological component rather than organic causes. While it is a common perception in the litigation arena that these signs are proof of malingering and fraud, they merely describe a constellation of signs used to identify pain in those who need more detailed psychological assessments." *Id.* (footnote omitted). "The literature . . . reveals that there is no association between positive Waddell signs and the identification of secondary gain and malingering. Patients with strong psychological components to their pain often display these signs as well." *Id.* at 160 (footnote omitted).

migraine headaches and non-restorative sleep without Ambien.[16] Her husband and grown children performed all of the house work because she was inactive. Dr. Lazar believed that the motor vehicle accident exacerbated Minor's migraine headache problem, and that she presented "some behaviors, such as rating her pain at a 10, that are frequently seen as exaggerating complaints although not necessarily intentional." AR 811. Dr. Lazar diagnosed "pain disorder due to a general medical condition (injuries sustained in a motor vehicle accident, history of migraines) with mild to perhaps occasionally moderate psychological/stress overlay." *Id.* He assigned a Global Assessment of Functioning (GAF) score of 45–50[17] and recommended use of self-regulatory techniques to manage painful symptoms.

On July 28, Minor consulted a neurologist, Dr. Paul G. Wasielewski, at Bronson Neurological Services. He diagnosed a closed head injury with probable bruising in the frontal lobe area, with post-traumatic headaches. He offered a trial of intravenous methylprednisolone to be given daily for five days, with increased Elavil at night for sleep. He also recommended an MRI of the brain and an MR venogram to rule out venous thrombosis. As he expected, both of these tests produced normal results.

In late summer and fall of 2005, Minor continued to visit Dr. Uggen, the pain clinic, and her primary care clinic. Dr. Uggen continued her on total disability and told her to be more diligent with exercise. Dr. Chafty at the pain clinic gave her two lidocaine infusions for myofascial back pain and

---

[16]Ambien is a sedative used for sleep. *See* Ambien, available at www.drugs.com/ambien.html (last visited on Dec. 31, 2012).

[17]GAF scores ranging from 41 to 50 indicate serious symptoms "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or any serious impairment in social or occupational functioning "(e.g., no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000) (DSM-IV-TR™).

suggested trigger point injections. Although Minor seemed interested in prescriptions for narcotics, he offered none. On nine separate occasions between August 31 and November 1, Minor received Stadol and Phenergan injections at her primary care clinic, as well as a prescription for Darvocet.[18]

In late 2005, Minor continued to see Dr. Ruoff and consulted with Dr. Richard Feinstein, a psychiatrist. Dr. Ruoff diagnosed "a migraine exacerbation that has moved into chronic daily headache exacerbation" compounded by head injury. Dr. Feinstein felt that Minor responded to Stadol with Phenergan because the closed head injury "was somewhat responsive to that shot." AR 399. Dr. Ruoff placed Minor on Wellbutrin SR to boost the antidepressant effect of other medications, increased Topamax, and referred her to a neurologist who specializes in closed head injuries.

Dr. Uggen continued to follow Minor for "post concussive syndrome and left shoulder contusion." AR 430, 573. She reported pain on her left side, with diffuse sensitivity to very light touch over her shoulder, anterior chest, posterior scapula, rib cage, and arm, which he could not explain in light of MRI studies that did not show major tears. He advised exercise to improve range of motion and retained her on total disability.

In November, Minor was again seen in the emergency room complaining of back pain and migraine headaches. On one occasion, the physical exam was unremarkable, but the physician administered Dilaudid, which Minor stated did not relieve the pain. She was then given morphine and discharged home. On the second occasion, physical findings suggested symptoms consistent with genuine migraine headache. The physician administered injections of Stadol and Phenergan,

---

[18]Darvocet is a combination of acetaminophen and a narcotic pain reliever. It was withdrawn from the U.S. market in 2010. *See* Darvocet, available at www.drugs.com/darvocet.html (last visited on Dec. 31, 2012).

and wrote: "I suspect the patient has a chronic musculoskeletal abnormality." AR 424. He instructed her to follow up with her primary care physician.

Dr. Ruoff continued injections of Stadol and Phenergan, but advised Minor that she could have rebound headaches and back pain secondary to opioids. He assessed her use of Stadol as "excessive," requiring a change in her medications and no more Stadol injections. He increased Elavil to improve sleep and prescribed a Duragesic patch.[19] He also administered injections of Toradol and Phenergan and urged her to continue on Topamax twice daily.

Despite his warnings, however, Dr. Ruoff continued to give Minor injections of Stadol, Phenergan, and/or Toradol in late 2005. On clinical examination he found decreased range of motion of the neck and trigger points in the shoulders bilaterally. He assessed "1. Posttraumatic headache. 2. Migraine headache. 3. Under anxiety and depression." AR 414, 416. He again increased the Elavil dosage, continued her on Duragesic patch and Xanax,[20] added Ambien for sleep, and provided a note for her to be off work until further notice due to posttraumatic and migraine headaches.

On November 10, Minor was seen by Dr. Melanie Novak at Southern Michigan Pain Consultants, PC. On physical examination, Dr. Novak found that forward flexion and extension of the neck and waist were severely restricted, with Minor giving a poor effort due to pain. Dr. Novak

---

[19]Duragesic is an opioid analgesic used to manage persistent, moderate to severe chronic pain in opioid-tolerant patients when a continuous around-the-clock opioid analgesic is needed for an extended period of time. *See* Duragesic, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=602 (last visited Dec. 31, 2012).

[20]Xanax is a benzodiazepine used to treat anxiety symptoms and panic disorder. *See* Xanax, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=1159 (last visited on Dec. 31, 2012).

12

noted severe tenderness to palpation in the cervical paravertebral region, greater on the left; some tenderness in the lumbosacral paravertebral region and in the left sacroiliac joint; and pain with palpation in the right lateral forehead region above the right eye. Dr. Novak's impression was that Minor was "having problems with both cervical and lumbomyofascial pain," shoulder pain due to tendonitis, migraine headaches, and degenerative changes in the lower lumbar spine causing radicular symptoms. She administered an epidural steroid injection at L5-S1 and trigger point injections in the left shoulder area.

On November 16, Minor visited Dr. Igor G. Kaps, a neurologist. He found significant palpatory tenderness in the cervical paraspinal muscles, on the left more than the right, and in the left shoulder muscles. He also found palpatory tenderness in the lower lumbar paraspinal area. He noted "a significant amount of giveaway weakness in the left upper and left lower extremity secondary to the shoulder and low back pain/hip pain." AR 469. His impressions were "1. Status post motor vehicle accident. 2. Post-traumatic brain injury. 3. Post-traumatic headaches. 4. Cervical and lumbar paraspinal myofacial pain. 5. Emotional difficulties/mood disorder (panic attacks, depression). 6. Rule out complex partial, post-traumatic seizures." AR 470. He recommended an EEG, neuropsychological testing, botox injections, psychological counseling, no driving or work, and help at home with multiple chores and activities that Minor was unable to perform. *Id.* Dr. Kaps apparently administered botox injections in the neck and shoulders.

In December, Dr. Feinstein diagnosed Minor with major depressive disorder, cognitive disorder secondary to closed head injury/traumatic brain injury, pain disorder associated with psychological factors and a general medical condition, and closed head injury. He stated that, in his expert opinion, "given that I regularly examine and treat [traumatic head injury] patients, these

13

diagnoses are significantly and directly related to the effects of the" car accident. Further, in his expert opinion, "these injuries and their effects have resulted in serious bodily impairments with consequent significant alterations and limitations in her functional capacity. There has been a dramatic life alteration as a result of the accident and a psychiatrically demonstrable change from her pre-accident abilities." AR 389. He listed her prognosis as "guarded." *Id.*

In early 2006, Minor's condition continued to worsen. Dr. Ruoff ordered blood tests and referred Minor to a gastroenterologist for symptoms of IBS. In early February, he summarized Minor's treatment history for the worker's compensation carrier, giving the following opinion:

> The patient had a history of migraine headaches with exacerbations stabilizing until she was in an automobile accident and sustained a posttraumatic brain injury as well as posttraumatic headaches. This fueled and exacerbated her migraines. She also developed cervical and lumbar myofascial pain especially in the neck and the left shoulder with radiation down the left arm. She also developed spasms of the low back with radicular pain down the leg. She had a history of depression in the past which was also coming under control and the accident, I believe, fueled her emotional difficulties with an increase in stress, panic attacks and depression. . . .
>
> I think that the best approach would be to see her on a regular basis and have 1 or 2 physicians handle the case. She continues to be in pain therapy, physical therapy, psychological and psychiatric therapy. She will continue to improve but this will be slow.

AR 319. Minor continued to receive injections of Toradol and Phenergan.

On February 16, Bradley Sewick, Ph.D., a licensed psychologist, conducted a neuropsychological evaluation of Minor, administering more than thirty tests. Intellectually, Minor was functioning with a WAIS-III Verbal IQ of 63, a Performance IQ of 72, and a Full Scale IQ of 70. She performed with evidence of moderate to severe impairment of memory in both immediate and delayed recall for both auditory and visual materials. Her overall processing speed abilities were significantly defective relative to other cognitive domains. She demonstrated significant difficulties

14

with cognitive flexibility, semantic abstraction, higher level novel problem solving and executive functions. "Results of the MMPI-2 indicate[d] a highly elevated and likely valid profile but with perhaps some enhancement of existing problems in a cry-for-help type fashion." AR 621. Findings included, among other things, significant symptoms of depression, somatic and pain concerns, fatigue, post-traumatic anxiety, and social withdrawal. There were objective indications of work interference. *Id.* The Behavior Change Inventory indicated significant changes in Minor's ability to function before and after the car accident. Dr. Sewick opined that

> the history of the 5/4/05 head trauma is consistent with literature concerning concussive brain injury in that there was blunt head trauma with post-traumatic memory loss, retrograde amnesia and persisting neurobehavioral changes. My impression is that she presents with a Cognitive Disorder secondary to the 5/4/05 head injury and a Pain Disorder with Dyssomnia aggravated by the 5/4/05 injuries and a Depressive Disorder with Panic Attacks aggravated by the 5/4/05 injuries.

AR 622. He felt that "she is not capable of working at this time given the magnitude of her cognitive dysfunction. She has trouble . . . handling routine chores within the home and requires assistance from others." AR 623. Dr. Sewick believed Minor was "clearly in need of ongoing psychiatric treatment" with individual psychotherapy and cognitive rehabilitation. *Id.*

In February and March, Minor continued to obtain injections of Stadol, Toradol, and Phenergan from her primary care clinic. On March 21, she was examined by Dr. Grant Hyatt, an orthopedic surgeon, for the worker's compensation carrier. He found an "[o]bjectively unremarkable examination of the neck and cervical spine" and some evidence that Minor exaggerated her pain. He determined that, assuming the MRI was accurate in finding tendonitis in the left shoulder, it was reasonable for Minor to avoid extensive or repetitive overhead use of the left arm, as well as

15

repetitive or forceful pushing or pulling with the left arm, which might exacerbate the tendon inflammation. He recommended physical therapy, noting Minor appeared to be over-medicated.

On March 24, Dr. Yasmeen Ahmad reviewed Minor's medical records for the worker's compensation carrier. He stated a diagnosis of "1. Migraine headaches, pre-existing, not related to the motor vehicle accident. 2. Cervical and lumbosacral pain, myofascial in origin." AR 341. He opined that Minor had "migraine headaches, which are transformed into analgesic rebound with narcotics dependence," which were not exacerbated by the car accident. AR 341–42. He further noted that Minor complained of myofascial pain, but felt this was "self-limited." Based on a normal MRI of the cervical and lumbosacral spine, he opined that she had "returned to her pre-accident status." AR 342. As a result of the opinions rendered by Dr. Hyatt and Dr. Ahmad, Minor's worker's compensation benefits ended.

The primary care clinic, however, continued to administer injections of Toradol, Depo Medrol, and Phenergan to Minor on multiple occasions for headaches, muscle spasms, and tenderness in the trapezius and neck muscles. She was also provided with an excuse from work. A complete gastrointestinal workup indicated she might have inflammation on the right side of the small bowel. An August 2006 MRI of the cervical spine showed "straightening of the normal lordotic curvature suggesting cervical paraspinal muscle spasm." AR 356–57. Minor was again seen in the emergency room complaining of headache, neck and back pain, or lower quadrant pain for which she received medications such as Dilaudid and Valium. Minor took more Vicodin than was prescribed, causing her to suffer from rebound headaches due to narcotic use. By October, Dr. Ruoff opined that Minor needed inpatient care to withdraw from medications and start a new treatment program. There are no records to substantiate that such a hospitalization occurred.

16

A diagnostic ultrasound of the left shoulder was performed in November which indicated "[t]endinosis of the supraspinatus tendon with no evidence for a rotator cuff tear. Small lipoma overlying the supraspinatus tendon." AR 316. This report was sent to Dr. Hyatt for review in December. He opined that the study was consistent with the earlier diagnosis of tendinitis, and the functional limitations he imposed earlier were still appropriate. A November electroencephalogram examination was normal, as were December MR angiograms of the intra- and extra-cranial arteries and an MRI of the brain. A December MRI of the cervical spine showed mild disc bulges at C5-C6 and C6-C7 "without neural compromise" and "straightening of the normal lordotic curvature suggesting cervical paraspinal muscle spasm." AR 651–52. Minor was hospitalized in late December for abdominal problems.

In 2007, Minor continued to visit the emergency room for complaints of pain, where she received various medications, including Oxycodone, Percocet,[21] and Xanax. In April Dr. Ruoff ordered various laboratory tests, which indicated that Minor may have rheumatoid arthritis. He diagnosed fibromyalgia with sleep disorder[22] and ordered the medications Toradol, Desyrel,[23] Depo-

_____

[21]Oxycodone is an opioid analgesic used to manage moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. *See* OxyContin, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=1196 (last visited Dec. 31, 2012). Percocet is a combination of acetaminophen and oxycodone. *See* Percocet, available at www.pdr.net/drugpages/concisemonograph.aspx?concise=407 (last visited Dec. 31, 2012).

[22]Fibromyalgia is "a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.3 (6th Cir. 2007) (quoting *Stedman's Med. Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)).

[23]Desyrel, or trazodone, is an antidepressant. *See* Desyrel, available at www.drugs.com/cdi/desyrel.html (last visited Dec. 31, 2012).

Medrol, and Percocet.  The notes from a May emergency room visit also state that Minor was diagnosed with fibromyalgia in 2007.

In August, Dr. Saadat Abbasi completed a Physical Residual Functional Capacity Assessment for the Commissioner based on medical records.  He indicated a primary diagnosis of fibromyalgia with a secondary diagnosis of motor vehicle accident.  He found that Minor could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit with normal breaks for about 6 hours in an 8-hour workday; and push and pull without limitation.  He also found that Minor could climb, balance, stoop, kneel, crouch, and crawl occasionally.  He found there were no manipulative limitations established, including reaching overhead, handling, fingering, and feeling.  He also found no visual, communicative, or environmental limitations established.  He believed that the severity of Minor's symptoms was not supported by the medical evidence of record, although he admitted that there were treating or examining source statements in the record that differed significantly from his own conclusions, pointing to the opinions of Dr. Kaps, Dr. Hyatt, and Dr. Targowski.

In September, Robert L. Griffith, Psy.D., a licensed psychologist, performed a Disability Determination Consultation for the Commissioner based on his personal evaluation of Minor.  He diagnosed Cognitive Disorder NOS (not otherwise specified), Pain Disorder related to psychological and medical factors, and Major Depression with Panic Disorder.  He also diagnosed "closed head injury, disc problems, shoulder and neck injury problems, fibromyalgia, and laparoscopic and gall bladder surgeries." AR 676.  Further, he found that Minor had psychological difficulties due to her medical conditions and chronic pain, her unemployment, and her husband's disabilities. He assigned her a GAF score of 52 and characterized her prognosis as "[u]nknown."  AR 676.

18

The same month, Matthew Rushlau, Ed.D., a specialist in psychology, completed Mental Residual Functional Capacity Assessment (MRFCA) and Psychiatric Review Technique (PRT) forms for the Commissioner. In the MRFCA, he found Minor

> is moderately limited with regards to maintaining concentration, managing social interactions, and completing daily activities. However, she has not experienced substantial loss with regards to her ability to understand, carry out, and remember simple instructions; make simple work-related judgments and decisions; respond appropriately to supervision, coworkers and work situations; and deal with changes in a routine work setting.

AR 682. In the PRT, Rushlau checked boxes for 12.02 Organic Mental Disorders and 12.04 Affective Disorders. He indicated Minor has "cognitive disorder nos," a medically determinable impairment that does not precisely satisfy the diagnostic criteria for 12.02. AR 685. He also found she has "major depression," a medically determinable impairment that does not precisely satisfy the diagnostic criteria for 12.04. AR 687. He did not find that Minor had an anxiety-related disorder, a somatoform disorder, or a substance addiction disorder. With regard to the "B" criteria of the listings, Rushlau found that Minor was moderately limited in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. He further found that she had not experienced any episodes of decompensation. Rushlau also found that the evidence did not establish the presence of the "C" criteria for Organic Mental (12.02), Affective (12.04), and Anxiety-Related (12.06) disorders.

In October, Dr. D. L. Newman, a family practice physician affiliated with the Detroit Institute of Physical Medicine & Rehabilitation, examined Minor. On clinical examination, he found that flexion of the cervical spine was limited to 50/90, extension to 55/90, right rotation to 45/90, and left to 50/90. He noted palpatory spasm of the posterior cervical spine musculature extending into the

19

left scapula. Range of motion of the left shoulder was limited in flexion and abduction to 15/180, external rotation to 5/90, internal rotation to 15/90, with pain noted in all planes of movement with palpation tenderness localized over the acromioclavicular joint extending to the biceps. Range of motion of the dorsolumbar spine was limited in flexion to 45/90, in extension, right and left rotation to 10/30, right and left bending to 5/20, with pain noted in all planes of movement with palpation tenderness localized over the lumbosacral joint extending into the left sacroiliac joint. Atrophy was noted in the left calf with the circumference measuring one inch less than the right calf. Dr. Newman diagnosed:

> 1) Traumatic cervical spine strain with a left scapulocostal component. 2) Adhesive capsulitis and tendinitis with a "frozen shoulder" on the left. 3) Traumatic myofascial dorsolumbar spine pain. 4) Clinical left sciatic radiculopathy. 5) Aggravation of underlying headaches, from migraine to daily headaches. 6) Aggravation of underlying migraine headaches. 7) Closed Head Injury with Traumatic Brain Injury with residual mood, memory changes.

AR 221. He opined:

> This patient requires ongoing care in a pain clinic setting for the chronic pain associated with the migraines and myofascial damage to the neck, shoulder, and back. Due to the problems with the neck and shoulders, she is limited in reaching, pulling, pushing, grasping, manipulating, and twisting and turning of her neck. With the back and left leg problems, she is limited in bending, lifting, twisting, turning, standing, walking, climbing, squatting and the like.

*Id.*

The administrative record does not contain any medical records for the year 2008. In 2009, Minor's pain and treatment course continued. Dr. Targowski examined her at least twice in January and administered Demerol and Phernegan because "she looks like she is in quite a lot of pain." AR 749, 752. In February, Dr. Greene refused to give Demerol and Phenergan and offered Toradol instead, but Minor declined that medication. In April, Dr. Ruoff found the complaints of pain out

20

of proportion to the physical findings, but gave Toradol and Demerol. She was found to have chronic pain syndrome. In March, Minor signed an agreement with Dr. Ruoff not to abuse pain medications and to utilize the services of only one physician or office and one pharmacy. On five occasions between April 21 and May 28, Minor received Demerol and Phenergan injections at the primary care clinic.

Minor was hospitalized from May 3 to 8 and May 12-14 for a full GI workup, but all tests produced normal results. In June, she received Demerol and Phenergan injections at least four times in the primary care clinic, once for abdominal pain.

On June 23, Dr. Ruoff noted that Minor's history of chronic liver pain led him to believe she probably had rheumatoid arthritis or lupus. The Demerol injections continued in late June and July. On July 7, Dr. Ruoff noted that Minor "has a history of severe fibromyalgia with the possibility of rheumatoid arthritis versus lupus not only because of testing done in the past but she has had swelling of her joints, especially of her metacarpophalangeals which were symmetrical and she has also had pain in the liver area with an increase in her liver function tests." AR 734. A rheumatologist at the University of Michigan interviewed Minor and concurred with Dr. Ruoff that she has "fibromyalgia along with probably lupus erythematosus." AR 734, 740.

From August to September, Minor was hospitalized with pancreatitis. She used a walker for ambulation.

On November 11, Dr. Ruoff completed a Physical Residual Functional Capacity Questionnaire for Minor. He listed her diagnoses as fibromyalgia, chronic pancreatitis, and rheumatoid arthritis and rated her prognosis as fair to poor. Her symptoms were noted as severe headaches, left neck pain, painful joints, low back pain, sciatic left leg, dizziness, and fatigue. He

21

indicated she had daily pain all over, and he identified the clinical findings and objective signs as "the range of motion of neck." AR 729. Dr. Ruoff stated that depression and anxiety affected Minor's condition. He found that her physical and mental impairments were reasonably consistent with her symptoms and functional limitations. He also found that her experience of pain would be severe enough to interfere constantly with her ability to pay attention and concentrate to perform even simple work tasks during a typical workday. He found that Minor was incapable of even "low stress" jobs. He said she could not walk without rest or severe pain, she could sit for one hour before needing to stand up, she could stand for 30 minutes, and she could sit and stand/walk less than 2 hours total in an 8-hour work day. He opined that she would need a job that permits shifting positions at will, unscheduled hourly breaks for 15 minutes, and elevation of the legs all of the time. She could rarely lift less than 10 pounds but never 10 pounds or more; she could occasionally look up or down, turn her head right or left, and hold her head in a static position. She could never twist, stoop, crouch, or climb ladders and could rarely climb stairs. She also had significant limitations (five percent of an 8-hour workday) in repetitive reaching, handling or fingering, and grasping. Dr. Ruoff indicated that Minor would have "95% BAD" days and would be absent from work more than four days per month. AR 733. He also stated she had been hospitalized regularly.

At the administrative hearing, Minor testified about her medical conditions, chronic pain, depression, and anxiety. She reported that she can sit for 30 minutes to 2 hours, stand for 15 minutes, lift 5 pounds, and walk "not even half a block." AR 40. She tries to walk inside the house, but not outdoors. She described very limited daily activities, noting she is "mostly in the bed." AR 49, 51. Her ex-husband lives with her and helps her bathe and dress. She uses a rolling walker that was prescribed for her. She was hospitalized nearly the entire month of August 2009 for pancreatitis.

22

Her doctors were considering insertion of a feeding tube because she was unable to keep solid food down and tolerated only a liquid diet. In 2009 she had four blood transfusions for anemia. Panic attacks make her "a prisoner in [her] own house." She has difficulty concentrating and experiences social withdrawal due to depression. She stopped getting psychiatric treatment because of lack of insurance to pay for it. At one point during the hearing, she asked to stand up because her muscles were cramping. Minor told the ALJ that she worked for twenty years, gave over "110 percent," and missed her job, which resulted in much of her depression. Her pain and depression also prevent her from playing with her grandchildren.

The ALJ presented three hypotheticals to Dr. Lozer, the vocational expert (VE). First, he asked the VE to assume that a person of claimant's age, education, and work experience is able to lift or carry 10 pounds frequently, stand or walk for 6 hours, and sit for 6 hours of an 8-hour workday with normal breaks; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; understand, carry out, and remember simple instructions, respond appropriately to supervisors, co-workers, and usual work situations, and deal with changes in a routine work setting on a sustained basis with only occasional interaction with the public; and work is limited to simple routine and repetitive tasks in an environment free of fast-paced production requirements, involving only few simple work-related decisions. He then asked the VE if such a person could perform Minor's past work as an operations supervisor. The VE answered no, but stated that the person could perform other light, unskilled jobs existing in sufficient numbers in the regional or national economy, including custodian, dishwasher, and general office clerk.

The ALJ then asked the VE to assume all of the same restrictions except that the person is able to lift up to 10 pounds occasionally, stand or walk for 2 hours in an 8-hour day, and sit for 6

23

hours with normal breaks; and occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds. The VE responded that such a person could not perform Minor's prior work, but the person could perform sedentary jobs existing in sufficient numbers in the regional or national economy, including office clerk and receptionist.

Finally, the ALJ asked the VE whether the claimant could perform the sedentary jobs listed if the same restrictions as in the second hypothetical were assumed, but the ALJ found credible the claimant's testimony that she was in bed most of the day and needed to lie down outside of normal breaks or lunch period. The VE responded that such a claimant would be unable to perform sedentary jobs. With regard to all answers, the VE confirmed that his testimony was consistent with the *Dictionary of Occupational Titles*.

Minor's attorney asked the VE whether Dr. Ruoff's RFC of not lifting over 5 pounds, standing for 30 minutes, and sitting, standing or walking for less than 2 hours would eliminate light work. The VE opined that such restrictions "would eliminate all full-time work." AR 65–66. He also agreed that any person who misses more than four days of work a month is disabled and that cognitive dysfunction as described by Dr. Sewick would rule out jobs.

In a written decision, the ALJ denied benefits at the fifth stage of the sequential analysis. 20 C.F.R. § 404.1520(a). At step one, he found that Minor met the insured status requirements through December 31, 2011, and that she had not engaged in substantial gainful activity since May 4, 2005, the alleged onset date. At step two, he found that Minor suffered from severe impairments for which she received treatment, including fibromyalgia, tendonitis of the left shoulder, migraines, chronic pain disorder, anemia, depression, and cognitive disorder. At step three, he determined that Minor's impairments or combination of impairments did not meet or medically equal one of the listed

24

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[24]  20 C.F.R. §§ 404.1520(d), 404.1525, & 404.1526.

> At step four, the ALJ found that Minor retained the residual functional capacity (RFC)
>
> to perform work limited to lifting 20 pounds occasionally and 10 pounds frequently; sitting for up to 6 hours and standing or walking for up to 6 hours in an 8 hour workday with normal breaks; only occasional climbing, balancing, stooping, kneeling, crouching or crawling; work further limited to simple, repetitive and routine tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few, if any, work place changes; able to understand, carry out and remember simple instructions and respond appropriately to supervisors, co-workers and usual work situations; deal with changes in a routine work setting on a sustained basis; and only occasional interaction with the general public.

AR 15.  The ALJ stated he considered all of Minor's symptoms and how they can reasonably be accepted as consistent with the evidence.  Although Minor's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he found that her statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC he determined.  "[T]he medical findings on examination and testing simply do not support the level of pain she claims.  Objectively, most of her testing is normal. . . . The only positive was some tendinosis in the shoulder confirmed on MRI."  AR 16.  The ALJ also discounted Minor's credibility based on intermittent statements by both treating and consulting sources that her complaints of pain were out of proportion to the physical findings on examination, that Minor appeared to exaggerate her symptoms, or that she was drug-addicted and sought narcotics.  Although the ALJ specifically discussed some of the findings of Drs. Ruoff,

---

[24]Minor does not contend on appeal that the ALJ should have found her disabled at step three.

Newman, Hyatt, Lazar, Sewick, and the State medical consultant, he failed to discuss the findings of Dr. Targowski, Dr. Feinstein, Dr. Kaps, Dr. Wasielewski, Dr. Chafty, Dr. Novak, or Dr. Griffith. He found the opinions of Dr. Hyatt and the State medical consultant to be more credible because their determinations gave "appropriate consideration to the unreliability of the claimant's complaints and are based on the more concrete objective findings. I find these are entitled to considerable weight." AR 18. With respect to Minor's psychological status, the ALJ noted that Drs. Lazar and Sewich arrived at "somewhat differing opinions regarding the level of any problem," but due to "the lack of any significant treatment" for psychological issues, he found that the State evaluation of Minor's status to be the most accurate summary and gave it considerable weight in determining the effect on RFC. That report was "also consistent with the claimant's appearance at her hearing, during which she was able to sit for nearly an hour without apparent distress and focus on questions for considerably longer than the 5-10 minutes alleged." *Id.*

At step five, the ALJ found that Minor could not perform her past relevant work as operations supervisor because that was a skilled job requiring frequent interaction with the public and more than simple decision-making. Considering her age as a younger individual, 20 C.F.R. § 404.1563, her education, work experience, and RFC in conjunction with the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ determined that Minor could not perform a full range of light work, but there were some light work jobs existing in sufficient numbers in the regional economy that Minor could perform, based on the testimony of the VE. Accordingly, the ALJ found Minor was not disabled and denied her application for benefits. The Appeals Council denied review, and the district court affirmed.

### III. STANDARD OF REVIEW

We review *de novo* a district court's decision concerning a social security benefit determination. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Because the Commissioner determines whether a claimant is disabled and entitled to benefits, 42 U.S.C. § 405(h), our review of the Commissioner's decision "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

### IV. ANALYSIS

The ALJ's analysis is flawed in several respects, including the failure to consider all of the medical evidence in the record, especially with regard to the diagnosis of fibromyalgia, when discrediting Minor's subjective complaints of pain, mental impairment, depression, and anxiety; the failure to follow the treating physician rule; and the failure to include all of Minor's physical and mental impairments in the hypothetical questions posed to the VE. These errors, when viewed in light of substantial evidence on the record as a whole, persuade us to reverse and remand the case to the Commissioner for a finding of disability as of May 4, 2005, and an award of benefits.

#### A. Objective medical evidence and the diagnosis of fibromyalgia

The ALJ discredited Minor's subjective complaints of pain on the ground that the objective medical findings on examination and testing "simply do not support the level of pain she claims."

27

Observing that most of her testing was normal, with only a positive finding of tendinosis in the left shoulder confirmed by MRI, the ALJ ignored other objective evidence of record supporting her claims of pain.

Minor has a history of migraine headaches from the age of nine, for which she was medically treated on a regular basis with oral and intramuscular painkillers of increasing strength and dosage. Despite these recurrent headaches, Minor continued to work at the job she held for eighteen years. During the motor vehicle accident in May 2005, Minor suffered a closed head injury with probable bruising in the frontal lobe area, resulting in post-traumatic headaches, as diagnosed by her neurologist, Dr. Wasielewski. He ordered an MRI of the brain and an MR venogram to rule out other significant brain injury, but he expected those tests to produce normal results and they did.

The lack of objective evidence of a brain injury on MRI did not preclude Minor's treating physicians from crediting her complaints of pain caused by migraine and post-traumatic headaches. Instead, they relied on positive clinical signs to confirm that Minor suffered from genuine headache pain. In addition, Minor's treating physicians knew that she suffered organic brain damage in the accident. After conducting thirty tests, Dr. Sewick found that Minor functions at a full scale IQ of 70 with evidence of moderate to severe impairment of memory, information processing speed, cognitive flexibility, semantic abstraction, higher-level problem solving, and executive functions. Her head trauma is consistent with concussive brain injury, resulting in a diagnosis of cognitive disorder not otherwise specified.

The medical record also demonstrates objective evidence of other physical injuries Minor sustained in the auto accident, including cervical sprain. An MRI taken in April 2005 showed normal curvature of the cervical spine. By contrast, x-rays taken in the emergency room immediately

28

following the car accident showed loss of the normal curvature of the cervical spine. Later MRIs confirmed loss of lordosis in the cervical spine and disc bulges. This condition caused muscle spasms in Minor's upper back and neck with myofascial pain. An MRI also revealed tendonitis in the left shoulder caused by the accident. Another MRI showed degenerative disc disease in her lumbar spine, which caused muscle spasms in the lower back with sciatic radiculopathy, ultimately leading to documented left leg atrophy and antalgic gait.

Further, during clinical examinations, Drs. Targowski, Ruoff, Novak, Kaps, and Newman all noted significant evidence of muscle spasms in Minor's full back and neck accompanied by significant loss of range of motion. Even the doctors who examined Minor for the worker's compensation carrier made similar clinical findings. Doctors prescribed courses of physical therapy to restore range of motion and release the muscle spasms. In addition, Drs. Ruoff and Novak administered pain injections directly into trigger points, and Dr. Chafty administered two lidocaine infusions in an effort to relieve the pain associated with muscle spasm. Numerous treating physicians prescribed oral pain medications and administered intramuscular injections of narcotics, of increasing strength and dosage, in efforts to ease Minor's pain.

By 2007, Dr. Ruoff, in consultation with a rheumatologist, diagnosed Minor with severe fibromyalgia and by 2009, he also suspected that Minor had rheumatoid arthritis or lupus based on laboratory tests documenting an elevated sedimentation rate and increased liver enzymes; swelling of the finger joints; lengthy hospitalization for pancreatitis; and Minor's ongoing complaints of IBS and abdominal pain. At the hearing, Minor testified about her very limited daily activities, her ongoing use of multiple medications, and her use of a prescribed walker to get around. She said that

her physical ailments, pain, depression, and panic disorder made her a virtual prisoner in her own home and that she missed her job, adding to her depression.

The ALJ failed to review any of this extensive objective medical evidence demonstrating Minor's physical illnesses and injuries, as required by the agency's regulations. He also did not persuasively explain why Minor's subjective complaints of pain were not credible or were inconsistent with this objective medical evidence. *See Rogers*, 486 F.3d at 246–248 ("blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence").

By regulation, the ALJ is required to consider all objective medical evidence in the record, including medical signs and laboratory findings, where such evidence is produced by acceptable medical sources, as was done here. *See* 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. The agency promises to "consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Further, the agency promises that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). The agency must follow and apply its own procedural regulations, and failure to do so warrants remand. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

In addition, our case law required the ALJ to give due consideration to Minor's diagnosis of severe fibromyalgia. We have repeatedly recognized that fibromyalgia can be a severe and disabling impairment. *Rogers*, 486 F.3d at 243 (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d

815, 820 (6th Cir. 1988) (per curiam)); *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859–60 (6th Cir. 2011); *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) (per curiam). "[U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243. They demonstrate normal muscle strength and neurological reactions and can have a full range of motion, as Minor did on some occasions. *See id.* The process of diagnosing this disease involves testing focal points for tenderness and ruling out other conditions through objective medical and clinical methods. *Id.* Fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

In *Rogers*, as in *Preston*, we reversed findings of no disability where the ALJ focused on objective evidence demonstrating normal clinical and testing results. *Rogers*, 486 F.3d at 244, 250. As in those cases, the ALJ here dismissed Minor's subjective complaints of pain in favor of opinions given by non-treating sources and failed to discuss at all the accepted medical standard for diagnosing fibromyalgia. *Id.* at 244. Like the treating doctors in those cases, Minor's treating physicians "observed tender points in the 'classic fibromyalgia distribution' . . . and recorded ongoing complaints of intense pain and stiffness throughout" Minor's neck and back. *Id.* The medical records document evidence of "a process of diagnoses elimination" as Minor's physicians sought to determine whether her symptoms resulted from trauma, fibromyalgia, or perhaps also rheumatoid arthritis or lupus. *See id.* This process "was neither acknowledged nor discussed by the ALJ." *Id.*; *Germany-Johnson*, 313 F. App'x at 778. Thus, "the ALJ's contention that the treating

31

physicians' assessments and opinions were unsupported by other objective medical evidence was simply beside the point." *Kalmbach*, 409 F. App'x at 862.

Instead of performing a proper analysis of the medical evidence under agency regulations and controlling case law, the ALJ cherry-picked select portions of the medical record to discredit Minor's complaints of pain. *See Germany-Johnson*, 313 F. App'x at 777 (noting the ALJ "was selective in parsing the various medical reports"); *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (noting ALJ's conclusion was "grounded in a myopic reading of the record combined with a flawed view of mental illness"). He pointed to statements in physicians' notes questioning whether Minor exaggerated her pain or exhibited narcotics-seeking behavior. While we harbor no doubt that on occasions Minor exaggerated her complaints of pain or sought narcotics, we are not convinced that her behavior can be interpreted only in a negative manner to discount her complaints of pain. The record equally supports a conclusion that Minor's behavior is explained by her diagnosed pain disorder, which the ALJ did not fully consider.

"The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention." *DSM-IV-TR™* at 498. Pain causes "significant distress or impairment in social, occupational, or other important areas of functioning" and "[p]sychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain." *Id.* Pain can lead to inactivity and social isolation, which in turn leads to depression, fatigue, lack of physical endurance, and more pain. *Id.* at 500. Minor's testimony at the hearing echoed this clinical description of the disorder. Individuals who have chronic pain disorder "are sometimes convinced that there is a health professional somewhere who has the 'cure' for the pain," and they may "spend a considerable amount of time and money seeking

32

an unattainable goal." *Id.* "Health care professionals may unwittingly play a role in fostering this behavior." *Id.*

Importantly for our discussion, the "pain is not intentionally produced or feigned" as in malingering. *Id.* Dr. Lazar, an examining psychologist, specifically noted that Minor presented some behaviors "frequently seen as exaggerating complaints although not necessarily intentional." AR 811. The ALJ improperly relied on Dr. Lazar's report to discredit Minor's subjective complaints of pain without recognizing that unintentional exaggeration of pain is an essential characteristic of the very pain disorder Dr. Lazar diagnosed. In addition, the agency's own evaluating psychologist, Dr. Griffith, whom the ALJ did not mention, agreed that Minor suffered from pain disorder among many other maladies, rated her GAF score at 52, and diagnosed her prognosis as "unknown." Instead of examining the voluminous medical evidence as supporting the opinions of the numerous treating physicians, the ALJ relied on less favorable portions of the notes of other non-treating sources and consultants who worked for the agency or the worker's compensation carrier.

To the extent Minor may have demonstrated drug-seeking behavior, we observe that the agency consultant who completed the MRFCA and PRT forms, Matthew Rushlau, did *not* find that Minor demonstrated a substance addiction disorder. If he had, the ALJ would have been required to consider the extent to which drug addiction was a material contributing factor to any determination of disability, *see* 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535, and that was not done.

Although Dr. Ruoff suggested that Minor needed inpatient treatment to withdraw from prescription medications, we note the medical record is silent as to whether any such rehabilitation was ever undertaken. We do know the record is replete with instances of treating physicians

33

administering narcotic medications to Minor even after observing her potential dependence on them and warning her not to abuse them. We cannot ignore the fact that dependence on narcotics or anti-anxiety medications, as well as abuse of those drugs, can develop as part of chronic pain disorder, with which Minor was diagnosed. *DSM-IV-TR™* at 500. Even individuals without a history of substance abuse, like Minor, "are at some risk for developing these problems." *Id.*

Finally, the ALJ disregarded Minor's psychological diagnoses of major depression, anxiety, and panic disorder because of "the lack of any significant treatment over the years for any psychological issues." AR 18. The ALJ found the State evaluation to provide a more accurate summary of Minor's mental status and gave it considerable weight.

These findings are not supported by substantial evidence on the record as a whole. Minor was treated for years with medications prescribed for depression, anxiety, and panic disorder. On numerous occasions the dosages of these medications were increased to respond to her symptoms. She sought help from a psychiatrist and attended counseling sessions with a psychologist until she no longer had insurance to pay for them. This record cannot reasonably or realistically be read as containing no "significant treatment" for these mental impairments. Furthermore, reliance on Rushlau's mental capacity assessment is suspect where the State's own consulting psychologist agreed with the mental diagnoses given by treating sources and characterized Minor's prognosis as "unknown." Even if it were true that Minor failed to seek treatment, a claimant's failure to seek mental health treatment is not probative of whether a mental impairment exists and should not be determinative in a credibility assessment. *See Boulis-Gasche,* 451 F. App'x at 493.

34

The ALJ's failure to mention, let alone analyze, all of this evidence in the record in accordance with agency regulations and controlling case law persuades us that his decision is not supported by substantial evidence and remand is required.

## B. The treating physician rule

Our previous discussion foreshadows our further conclusion that the ALJ violated the treating physician rule. The agency promises claimants that it will give more weight to the opinions of treating sources than to non-treating sources. 20 C.F.R. § 404.1527(d). The opinions of treating physicians carry more weight because they likely provide "a detailed, longitudinal picture" of the claimant's medical impairment(s) that cannot be obtained from objective medical findings alone or from reports of consultants' examinations. *Wilson*, 378 F.3d at 544. An ALJ must give a treating source opinion concerning the nature and severity of the claimant's impairment controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d at 406. However, a doctor's opinion that a patient is disabled from all work may invade the ultimate disability issue reserved to the Commissioner and, while such an opinion could still be considered, it could "never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) ("Medical sources often offer opinions about whether an individual . . . is 'disabled' or 'unable to work[.]' . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner."); 20 C.F.R. § 404.1527(e)(1).

If the ALJ decides not to give a treating physician's opinion controlling weight, the ALJ may not reject the opinion, but must apply other factors to determine what weight to give the opinion,

such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source[.]" *Wilson*, 378 F.3d at 544 (citing § 404.1527(d)(2)). If benefits are denied, the ALJ must give "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *Rogers*, 486 F.3d at 242 (citing Rule 96-2p for the proposition that all cases carry a rebuttable presumption that a treating physician's opinion "is entitled to great deference, its non-controlling status notwithstanding").

Although the ALJ specifically referred to some, but not all, of the opinions of Drs. Ruoff, Newman, Lazar, and Sewick, he did not even mention the opinions of Drs. Feinstein, Kaps, Wasielewski, Chafty, and Novak. The necessary corollary is that the ALJ failed to determine whether these physicians qualified under the regulation as treating sources and whether their opinions were entitled to controlling weight or some lesser weight. 20 C.F.R. § 404.1527. The ALJ could not ignore or reject these physicians' opinions without giving a principled basis for doing so, *id.*; *Wilson*, 378 F.3d at 544, and if the ALJ determined that these opinions should not be given controlling weight, the ALJ was required to give "good reasons" for that decision. *Rogers*, 486 F.3d at 242.

Here, the ALJ did not consider a large portion of the objective medical evidence described in the prior section of this opinion. He did not consider that physicians in the primary care clinic treated Minor for approximately twenty years and that Dr. Ruoff treated Minor for a period of more

than four years prior to the hearing. He did not consider the specialities of the various physicians who treated Minor or explain why their opinions diagnosing numerous disorders were not worthy of great deference, as we find they are. He failed to consider her extensive medication regimen or its side effects except to find that she was narcotic-dependent without recognizing and noting that this was part of her pain disorder. None of Minor's treating physicians opined that she could work, and even Dr. Uggen, a worker's compensation orthopedic surgeon, placed Minor on total disability. Despite this evidence, the ALJ instead gave credence to the opinions of non-examining sources.

These legal errors are not harmless because they effectively result in disregard of nearly all of the medical evidence supporting a finding that Minor is disabled. *See Kalmbach*, 409 F. App'x at 862 (finding ALJ legal errors in applying treating physician rule did not amount to harmless error). Therefore, we conclude that the ALJ's violation of the treating physician rule undermines his decision. *See Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (noting "[w]e do not hesitate to remand" when an ALJ violates the treating physician rule).

## C. Hypothetical questions to the VE

Finally, the errors we have identified fatally corrupted the ALJ's analysis at step five of the sequential process. The Commissioner carries the burden at step five to show that the claimant can perform work available in the economy. *Wilson*, 378 F.3d at 548. Having improperly discredited Minor's subjective complaints of pain and having improperly ignored the significant objective medical evidence and the opinions of Minor's treating physicians, the ALJ did not formulate hypothetical questions that comprehensively captured all factors relevant to the VE's determination of whether gainful work exists that Minor can do. It also appears that the ALJ's comments on Minor's demeanor at the hearing violated the condemned "sit and squirm" test. *See Martin v. Sec'y*

37

*of Health & Human Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984) (disallowing "the dismissal of a claim for pain solely on the ALJ's observations at the hearing"); *Johnson v. Comm'r of Soc. Sec.*, No. 99-1438, 2000 WL 332059, at *4 (6th Cir. Mar. 22, 2000) (per curiam) (same); *Miller v. Sullivan*, 953 F.2d 417, 422 (8th Cir. 1992) ("Although the demeanor of a claimant may be noticed by an ALJ, [he] cannot reject a claimant's credibility on account of failure to 'sit and squirm' during a hearing.")

Minor's attorney asked the VE whether the RFC found by Dr. Ruoff would eliminate light work. The VE opined that such restrictions "would eliminate all full-time work." AR 65–66. In addition, Dr. Ruoff predicted that Minor would miss more than four days of work each month, and the VE agreed that any person absent from work that often is disabled. He also conceded that cognitive dysfunction at the level described by Dr. Sewick would rule out jobs. *See Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 652 (6th Cir. 2011) (remanding for an award of benefits where VE testified that claimant was disabled if treating physician's opinion were credited).

## V. CONCLUSION

We have authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). Benefits may be awarded immediately if all essential factual issues have been resolved, "the proof of disability is strong, and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming." *Kalmbach*, 409 F. App'x at 865 (citing *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). "Such is the case here." *Id.* In light of the opinions of the treating physicians, Minor's assertions of disabling pain arising from documented

38

physical illness, injury, and mental impairment, and the extensive medical record, we conclude that substantial evidence on the record as a whole supports a finding of total disability. *See id.*

Accordingly, for all of the reasons stated, we **REVERSE** the judgment and **REMAND** with instructions to the district court to remand the case to the Commissioner for the limited purpose of granting an award of benefits as of the disability onset date, May 4, 2005.