**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0408n.06

**No. 18-2343**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED** Aug 06, 2019 DEBORAH S. HUNT, Clerk |

DAWN D. WILSON,                                    )
                                                   )
        Plaintiff-Appellant,                       )
                                                   )
v.                                                 )        ON APPEAL FROM THE
                                                   )        UNITED STATES DISTRICT
                                                   )        COURT FOR THE EASTERN
COMMISSIONER OF SOCIAL SECURITY,                   )        DISTRICT OF MICHIGAN
                                                   )
        Defendant-Appellee.                        )        OPINION
                                                   )

---

**BEFORE: BOGGS, MOORE, and STRANCH, Circuit Judges.**

**JANE B. STRANCH, Circuit Judge.** Dawn Wilson appeals the district court's opinion affirming the Commissioner of Social Security's denial of Social Security disability insurance benefits. Substantial evidence on the record as a whole establishes that Wilson is disabled by multiple physical impairments. Because the Commissioner's decision to reject Wilson's application is flawed in several respects, we **REVERSE** and **REMAND** for an award of benefits.

## I. BACKGROUND

### A. Factual Background

Wilson was born in 1967 and has both a high school and some college education. She previously worked for 15 years as a mail handler for the United States Postal Service, leaving in 2004 due to worsening fibromyalgia. In 2005, she worked as a day care assistant, then she worked

several months in 2006 at a staffing agency and several months in 2008 in tax preparation services. Wilson has not worked since March 2008.

The medical record before us contains notes from Wilson's numerous medical examinations from May 2008 to June 2016 for pain all over her body, particularly in her back and hands, as well as for reasons unrelated to her disability claims. For purposes of this appeal, we summarize only the examinations key to her disability insurance benefits application, specifically the three opinions from her treating physicians—one from Dr. Terea Harris in 2010 and two from Dr. Jayashree Sekaran in 2011 and 2013. Also key are two consultative examinations requested by the Commissioner in 2011—a physical examination by Dr. Ernesto Bedia and a psychological examination by Dr. M. Dibai—and the 2016 testimony of Dr. Maria Rivero, a nonexamining physician who reviewed Wilson's medical records.

Since 2000 or 2001, Wilson has suffered from fibromyalgia, a disorder of unknown cause that is characterized by musculoskeletal pain and issues with fatigue, sleep, memory, and mood. The record contains a 2008 objective diagnosis of fibromyalgia based on a test finding 12 of 18 "tender points" on her back, but it is undisputed that Wilson has a long history of pain and other symptoms related to the disorder.[1] Since 2004, magnetic resonance imaging (MRI) scans of Wilson's lumbar spine have shown mild facet arthropathy, or degenerative arthritis affecting the facet joints of the spine, resulting in chronic low back pain. Since 2008, Wilson has also suffered wrist pain and difficulty with fine manipulation of her fingers—symptoms of carpal tunnel syndrome, with which she has also been diagnosed.

Dr. Harris, Wilson's treating physician from September 2009 to October 2010, provided an August 2010 medical assessment of ability that noted diagnoses for fibromyalgia, carpal tunnel

---

[1] Because the record does not contain any physician notes from before 2008, it is unclear when and how Wilson was first diagnosed with fibromyalgia.

syndrome, and facet arthropathy, specifically finding a "belatedly" positive Tinel's test for carpal tunnel syndrome. Dr. Harris treated Wilson's pain with physical therapy, steroid injections, and the drug Lyrica, each of which were reportedly ineffective. Dr. Harris opined that Wilson was not capable of performing a full-time job. She indicated that Wilson was able to lift 3 to 5 pounds frequently; could stand, walk, or sit 1 to 2 hours each in a workday for 30 minutes at a time, but should elevate her legs at 90 degrees for prolonged sitting; required unscheduled breaks of 30 or more minutes every 45 minutes; would be absent more than 4 days per month; could use her hands and fingers for less than 1 hour, and arms for less than 2 hours, in a workday; and had impacted ability to attend and concentrate on simple work tasks.

Wilson also obtained an unsigned medical assessment of ability dated December 15, 2011, containing similar diagnoses and conclusions about Wilson's restrictions. In submitting the assessment to the ALJ in January 2012, Wilson's attorney mistakenly attributed the assessment to Dr. "Jay Sakiorion"—the parties have since clarified that this assessment was in fact performed by internal medicine specialist Dr. Jayashree Sekaran, Wilson's treating physician beginning in October 2010.[2] Dr. Sekaran diagnosed Wilson with fibromyalgia, bilateral carpal tunnel syndrome, and facet arthropathy. Dr. Sekaran prescribed muscle relaxants, antidepressants, lidocaine infusions, acupuncture, injections into the bilateral carpal tunnels, and epidural injections, each of which provided only temporary relief. She noted that Wilson could not use nonsteroidal anti-inflammatory drugs (NSAIDs), a class of drugs used to reduce pain and inflammation, because Wilson had donated one kidney, and that Wilson had difficulty climbing stairs, sitting or walking for a prolonged period of time, and performing repetitive movements with her hands. According to Dr. Sekaran, Wilson was able to lift up to 6 pounds frequently and

---

[2] The Commissioner acknowledges in her brief that Dr. Sekaran completed Wilson's Social Security disability forms in December 2011.

10 pounds occasionally; stand or walk a total of 3 hours and sit a total of 3 hours in a workday; and use her bilateral upper extremities for reaching, handling, and fingering less than 4 hours in a workday; in addition, she required unscheduled breaks of at least 1 hour every 45 minutes and would be absent more than 4 days per month.

Dr. Sekaran continued to treat Wilson for fibromyalgia, carpal tunnel syndrome, facet arthropathy, and also pain in her left thigh and right shoulder. Two years later, in December 2013, Dr. Sekaran signed another medical assessment containing nearly identical language and restrictions as the December 2011 assessment.

Upon the Commissioner's request, in 2011, Dr. Bedia and Dr. Dibai performed physical and mental consultative evaluations of Wilson.

Dr. Bedia's November 2011 evaluation acknowledged Wilson's history of fibromyalgia, finding that Wilson suffered pain "mostly in the entire back and also the hands." He noted that Wilson "can only go biking two miles or go up and down the stairs 10-15 minutes a day." His examination found a full range of movement in Wilson's joints and back, that she was ambulatory with a stable gait, and that "her [f]ine and gross manipulations are intact." Dr. Bedia's administration of Tinel's and Phalen's tests were negative for carpal tunnel syndrome. In contrast to the restrictions described by Dr. Harris and Dr. Sekaran, Dr. Bedia found Wilson capable of performing full-time work—that she could lift and carry up to 20 pounds frequently and 50 pounds occasionally; sit for 8 hours at a time and 8 hours during a workday; stand for 4 hours at a time and 8 hours during a workday; walk for 3 hours at a time and 6 hours during a workday; and frequently use both hands in reaching, handling, fingering, and feeling.

In Dr. Dibai's consultative psychiatric evaluation in February 2011, he noted Wilson's history of fibromyalgia from 2001 and that "she appeared remarkably preoccupied with somatic

complaints and pain." Though Dr. Dibai wrote that "[b]ased on the history and clinical findings, the patient persistently is complaining of pain based on what she has come up with on the computer," he "rule[d] out factitious disorder," a condition in which the patient consciously creates symptoms for medical attention. He did not find that Wilson suffered depression or any psychiatric limitations.

Finally, after reviewing Wilson's medical record, Dr. Rivero testified at a hearing before an Administrative Law Judge (ALJ) about Wilson's "well documented" fibromyalgia, bilateral hand pain, "well documented numbness and inability to do repetitive movement" in both hands, facet arthropathy, and joint problems. When asked if the evidence in the record supports the restrictions Dr. Harris listed in 2010, Dr. Rivero replied:

> Eventually, but not at that time . . . some of these notes don't document the function, so it's difficult, but clearly there aren't real good notes prior to '12, and there is, in 8F, [Dr. Bedia's] consultative examination where she was asked and said that she was biking two miles a day, could drive, had a normal gait, and the exam was basically normal. That's in [November] of '11. And that would tend to contradict the notion that she couldn't do sedentary work.

Dr. Rivero concluded that the medical evidence did not substantiate Dr. Harris's or Dr. Sekaran's assessments in 2010 or 2011, but she found Wilson totally disabled by October 2012 based on notes showing Wilson suffered from more recent issues with her left thigh and right shoulder, in addition to fibromyalgia, hand and wrist pain, and back pain. Dr. Rivero testified that by October 2012, Wilson could sit for less than 3 hours a day while shifting in place at her work; stand for a maximum of 15 minutes at a time for a total of 1 hour of standing in a workday; walk for 15 minutes at a time for total of 30 minutes of walking; and perform occasional handling and fingering with both hands. She did not mention the psychiatric consultation with Dr. Dibai.

### B. Procedural Background

Through her prior employment, Wilson is eligible for Social Security disability insurance under Title II of the Social Security Act. Her insured status expired on March 31, 2011. She protectively filed for a period of disability insurance benefits on July 26, 2010, at the age of 43, alleging that she has been disabled since July 1, 2004, due to fibromyalgia; pain in her mid-back, neck, hands, and feet; a broad-based disc bulge at L4-L5 with bilateral narrowing; and spinal degenerative changes with hypertrophy. Following denial of her claim, Wilson requested a hearing before an ALJ, beginning the first of her four ALJ hearings, which have resulted in three ALJ decisions, two remands by the Appeals Council, one remand by the district court, and this appeal.

### 1.    2012 Decision

Wilson appeared at the hearing before ALJ John Dodson with a representative and testified to the pain she suffered due to her fibromyalgia, carpal tunnel syndrome, and back problems, pain at times "so high [she] could barely move at all." She described her daily routine of light activities—stretching, getting her teenage children ready for school, driving them to and from school, doing light housework and minimal cooking, napping, watching television, and reading. She attested to feeling "lightheaded, "a little loopy," and "lethargic" due to the side effects of taking pain medications and an antidepressant. Vocational expert Scott Silver testified that Wilson's only relevant prior work was as a mail handler and that with the pain and limited mobility in her hands and wrists, as well as with a sit/stand option, she would be limited to light work, such as tax preparation.

ALJ Dodson determined that Wilson was not disabled and denied her benefits at the fifth stage of the sequential disability analysis mandated by regulation. *See* 20 C.F.R. § 404.1520(a). He noted that the record contained normal X-rays of her hands and feet, MRIs of her spine indicating only mild facet hypertrophy, and two positive tests for carpal tunnel syndrome but no

"electrodiagnostic support" for a diagnosis. He noted that Wilson had no psychiatric limitations to returning to work but that "Dr. Dibai's psychiatric examination raises more questions about the claimant's credibility" because her "somatic complaints were based on what she found on the computer." He found Wilson not credible because the medical record contained "few probative findings before the end of her coverage" and because "[s]he had the use of her arms and legs, and took care of three school age children." Having "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," ALJ Dodson concluded that Wilson was capable, through the date last insured, of performing "light exertional work," including her past work as a tax preparer.

The Appeals Council reviewed the decision and vacated ALJ Dodson's decision based on four errors: (1) "[t]he decision does not include evaluations of the treating source opinions from [Terea] Harris, M.D., in Exhibit 3F, and Jay Sakiorion [sic], M.D., in Exhibit 10F"; (2) "the record contains an unsigned medical source statement, dated August 21, 2010,[3] which was not addressed in the decision"; (3) the finding that Wilson had "the residual functional capacity to perform a limited range of light work" was not sufficiently clear or specific; and (4) the finding that Wilson could still perform her past relevant work as a tax preparer was not supported by substantial evidence. The Appeals Council vacated the decision and remanded with instructions to give further consideration to Wilson's maximum residual functional capacity by evaluating the treating source opinions, to evaluate further whether Wilson can perform her past relevant work, and, if warranted, to obtain supplemental evidence from a vocational expert.

---

[3] The unsigned statement is actually dated December 15, 2011 and was presented by Wilson's counsel in January 2012 as the opinion of Dr. "Sakiorion." Dr. Harris's signed statement is dated August 21, 2010.

## 2. 2014 Decision

On remand, Plaintiff appeared and testified at a second hearing before ALJ Dodson on December 4, 2013. The vocational expert Silver testified again, this time stating that Wilson could work as a sedentary surveillance monitor. ALJ Dodson issued another unfavorable decision on January 17, 2014, finding that Wilson had not submitted any additional evidence of disability. He found that Dr. Harris's and Dr. Sekaran's assessments "are unaccompanied by any pertinent clinical or objective findings and are not part of the ongoing medical record," and thus "should not be given controlling weight." He again focused on Wilson's testimony about her everyday activities, including that "she could wash and dress herself" and "drive a car," and concluded that her file was "based more on subjective complaints than on actual, objective findings." He did, however, "give some weight to her back and hand discomfort" to find that she had work limitations, such as a sit/stand option, no lifting over five pounds, no repetitive twisting with the hands bilaterally, and no concentrated exposure to temperature extremes, such that she could perform only "sedentary exertional work." Because she could work as a surveillance monitor, as identified by the vocational expert, the ALJ denied her disability insurance benefits again.

The Appeals Council declined to review this decision. Wilson sought judicial review in the district court, and the parties stipulated to remand to the Appeals Council for further consideration of Dr. Harris's 2010 opinion, Dr. Sekaran's 2011 and 2013 opinions, and Wilson's maximum residual functional capacity, and to "offer [Wilson] the opportunity for a hearing."

In October 2015, the Appeals Council again remanded the case, assigning it to a new ALJ, Melody Paige (hereinafter "the ALJ"). The Appeals Council determined that the 2014 decision did not "adequately evaluate treating source opinions" from Dr. Harris and Dr. Sekaran and "did not address Dr. Harris' finding of positive Tinel's bilaterally." The 2014 decision also "did not weigh these treating source opinions using all the factors provided in 20 [C.F.R. §] 404.1527."

The Appeals Council instructed the ALJ to: (1) "[g]ive further consideration to the treating source opinions of Dr. Harris and Dr. Sekaran . . . , and explain the weight given to such opinion evidence"; (2) "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations"; and (3) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert."

### 3.     2017 Decision

Wilson testified about her pain and daily activities at her third hearing in June 2016—her first before this ALJ. The ALJ held another hearing on October 18, 2016, for medical and vocational expert testimony. There, Dr. Rivero testified that clinical and objective evidence did not support Dr. Harris's or Dr. Sekaran's opinions until October 2012, after Wilson's last insured date of March 31, 2011. Psychiatric medical expert Dr. Michael Rogell (referred to as Dr. Wargell in the hearing transcript and the ALJ's decision) testified that there was no supporting evidence of factitious disorder but that Wilson's depression and other psychiatric issues had only a mild impact on her daily life. Vocational expert Harry Cynowa testified that a hypothetical individual of Wilson's age, education, work experience, and residual functional capacity (but capable of lifting up to ten pounds) during the relevant period could work as a surveillance monitor. Cynowa estimated that over 120,000 such jobs existed nationally. When asked a hypothetical that included some of the restrictions described by Dr. Harris in 2010 and Dr. Sekaran in 2011, Cynowa responded that no jobs existed for someone who required unscheduled hour-long breaks throughout the day and would need four or more days off a month. Wilson's counsel also submitted testimony given by the previous vocational expert, Silver, in a different proceeding, which stated that the surveillance monitor job he had earlier described for a person with limited sedentary capacity no longer existed in the national or local economy.

In January 2017, the ALJ issued a final decision that Wilson was not disabled before March 31, 2011, when her insured status ended; like ALJ Dodson, she denied benefits at the fifth stage.[4] The ALJ concluded that "Dr. Rivero testified that the residual functional capacity assessments from Dr. Harris and Dr. Sekaran, which appear to vocationally disable her by this date, are not supported by clinical and objective evidence." The ALJ gave no weight to Dr. Sekaran's conclusions before the date Dr. Sekaran signed her December 2013 assessment, though the ALJ failed to specifically discuss Dr. Sekaran's December 2011 assessment. Finding that ALJ Dodson's 2012 and 2014 decisions "already postdate the date that [Wilson] was last insured," the ALJ specified that those decisions "should be referenced for a discussion of the pertinent medical exhibits." The ALJ discounted Wilson's subjective claims of pain and drowsiness because "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence." The ALJ concluded that through March 2011, Wilson had the residual functional capacity for sedentary work with the same limitations found by ALJ Dodson in 2014 and thus that Wilson could perform other work that exists in significant numbers in the national economy, namely, security monitor.

Wilson again sought judicial review. The magistrate judge issued a report and recommendation recommending affirming the ALJ's decision, which the district court upheld in its entirety over Wilson's objections. This timely appeal followed.

## II. ANALYSIS

We review the district court's decision concerning a Social Security benefits determination de novo. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). Our review of the

---

[4] The version of the rules in effect in January 2017, when the ALJ rendered her opinion, applies. For clarity, where the rules have been moved or have changed in substance since that time, it is noted.

Commissioner's determination that a claimant is disabled, *see* 42 U.S.C. § 405(h), "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). "An ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

Wilson argues that the ALJ inappropriately incorporated by reference the discussion of medical exhibits in ALJ Dodson's 2012 and 2014 decisions, thereby failing to follow the Appeals Council's remand instructions. She also argues that the ALJ did not properly consider the three treating source opinions or the credibility of her subjective complaints and that the ALJ did not meet its burden to show work she could perform. The Commissioner argues that the ALJ gave adequate reasons for why she discounted the treating source opinions and Wilson's subjective complaints and that her finding of no disability is supported by substantial evidence. We consider these arguments, beginning with the Appeals Council's remand instructions.

## A. Remand Instructions

When the Appeals Council issues a remand order to an ALJ, the ALJ must "take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). When a remand order contains detailed instructions concerning the scope of the remand and the issues to be addressed, "further proceedings in the trial court or agency from which appeal is taken must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any

proceedings inconsistent therewith is [sic] error." *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967); *see also Kaddo v. Comm'r of Soc. Sec.*, 238 F. Supp. 3d 939, 944 (E.D. Mich. 2017) ("[T]he failure by an ALJ to follow a remand order from the Appeals Council, even if that failure is allowed to stand by a later Appeals Council ruling, can constitute a reversible error in federal court. This holds true regardless of whether substantial evidence otherwise supports the Commissioner's final decision.").

The 2017 ALJ decision currently before us was issued pursuant to a remand order from the Appeals Council. This remand order specifically instructed the newly-assigned ALJ to consider Dr. Harris's and Dr. Sekaran's treating source opinions (including Dr. Harris's positive Tinel's test) and explain the weight given to them, to consider Wilson's maximum residual functional capacity and provide appropriate rationale with specific references to the record, and to obtain supplemental evidence from a vocational expert, if warranted.

Wilson argues that the ALJ abdicated her responsibility to address those orders on remand by incorporating by reference the 2012 and 2014 decisions' analyses of medical exhibits, which failed to include the treating source opinions and, she contends, did not evaluate the medical evidence as a whole. Like the district court, we do not hold that an ALJ may never incorporate by reference a vacated opinion, though there are circumstances in which it is reversible error to rely on a vacated opinion containing erroneous conclusions not supported by substantial evidence. *See Spence v. Colvin*, No. 3:11cv00341, 2013 WL 5492637 (S.D. Ohio Oct. 2, 2013), *report and recommendation adopted*, No. 3:11cv00341, 2013 WL 5806474 (S.D. Ohio Oct. 29, 2013). Neither remand order in Wilson's case found that ALJ Dodson's conclusions were not supported by substantial evidence; rather, both orders focused on the inadequate consideration of Dr. Harris's

and Dr. Sekaran's opinions. The 2017 decision thus did not necessarily commit reversible error by incorporating the discussion of medical exhibits from the 2012 and 2014 decisions.

It remains at issue whether the ALJ took the actions ordered by the Appeals Council. Reference to the 2012 and 2014 opinions does not satisfy the requirement that the ALJ give further consideration to the treating source opinions and to Wilson's residual functional capacity. We will consider the incorporated contents of the 2012 and 2014 opinions in addressing whether the ALJ applied the correct legal standards in her decision—including following remand instructions—and came to a conclusion supported by substantial evidence. *See Rogers*, 486 F.3d at 241; *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989).

### B. Treating Source Opinions

The crux of each remand in this case has been the inadequate analysis of the opinions of Dr. Harris and Dr. Sekaran. Claimants are promised that ALJs "will evaluate every medical opinion [they] receive." 20 C.F.R. § 404.1527(c). Generally, medical opinions are categorized into three types based on the doctor's role: treating sources, nontreating but examining sources, and nonexamining sources. *Id.*; *see Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). A treating source is the claimant's "own acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2). A treating source is generally "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* § 404.1527(c)(2).

Under the treating physician rule, the ALJ must "give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it 'is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Gentry*, 741 F.3d at 723 (quoting 20 C.F.R. § 404.1527(c)(2)). In the 2017 decision, the ALJ refused to give controlling weight to Dr. Harris's and Dr. Sekaran's treating source opinions because "Dr. Rivero testified that the residual functional capacity assessments from Dr. Harris and Dr. Sekaran, which appear to vocationally disable her by this date, are not supported by clinical and objective evidence."

But even if the ALJ finds "that a treating source medical opinion . . . is not entitled to 'controlling weight,'" that does "not [mean] that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). The ALJ must still determine how much weight to give the treating source opinion based on the following factors: the length of the treatment relationship, nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. 20 C.F.R. § 404.1527(c). "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527([c])(2)[5]). And even if substantial evidence supports the ALJ's weighing of each of the treating physician opinions, "substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527([c])(2) as harmless error." *Blakley*, 581 F.3d at 410; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004) ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion . . . .").

---

[5] The language of 20 C.F.R. § 404.1527(d)(2) was moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012.

Because the treating source opinions were denied controlling weight, we ask whether the ALJ assigned a weight to the opinions and properly considered the factors in 20 C.F.R. § 404.1527(c). The ALJ generally stated that "the medical expert testimony provides no basis for changing the claimant's residual functional capacity" because those treating source assessments "are not supported by clinical and objective evidence." This vague statement fails to "*explain* the weight given" to each treating source opinion, as required by regulation and the Appeals Council's remand. *See* 20 C.F.R. § 404.1527(c)(2).

We thus consider the reasons given for discounting each treating source opinion. Wilson argues for the first time on appeal that the ALJ should have given controlling weight to Dr. Harris's 2010 assessment. The Commissioner responds that this argument is forfeited. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) ("The district court did not have an opportunity to pass on these arguments, and we will not address them."). We agree and decline to address the weight the opinion should have been given. The 2010 assessment, however, remains part of the record and may corroborate or contradict other medical evidence.

Turning to Dr. Sekaran's 2013 assessment, the ALJ concluded that "the assessment from Dr. Sekaran was not signed and dated until December 2013. Hence, the undersigned will give no weight to this doctor's conclusions before December 2013." "[P]ost-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date." *Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 477 (6th Cir. 2018). Because the 2013 assessment does not relate to Wilson's condition before March 2011, the ALJ sufficiently explained her rationale for giving no weight to this assessment.

The ALJ, however, failed to address or explain Dr. Sekaran's 2011 assessment. First, the ALJ's analysis of the 2013 assessment seems to conflate the 2011 and 2013 assessments, noting

that "the assessment from Dr. Sekaran was not signed and dated until December 2013" and not mentioning the other unsigned assessment from December 2011. The ALJ then says she "will give no weight to this doctor's conclusions before December 2013." The ALJ's one parenthetical reference to Exhibit 10F, the 2011 assessment, refers to Dr. Rivero's testimony about the 2011 assessment, but Dr. Rivero also conflated the 2011 and 2013 assessments. There is thus no specific analysis of the 2011 assessment in the ALJ's opinion, despite explicit instructions from the Appeals Council to consider both of Dr. Sekaran's opinions. The ALJ therefore failed to comply with the remand order and with 20 C.F.R. § 404.1527.

Under certain limited circumstances, failure to discuss the § 404.1527(c)(2) factors and explain the weight given to treating source opinions may be harmless error. *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747, 750 (6th Cir. 2007) (finding that "the harmless-error inquiry require[s] more than a showing that the claimant simply had little chance of winning on the merits"). But by ignoring Dr. Sekaran's 2011 assessment, the ALJ failed to satisfy § 404.1527(c)(2)'s goal of providing "the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. And, "invoking the harmless-error exception . . . where the ALJ entirely failed to address the primary treating source's presumptively supportable opinion . . . plainly risks having the exception swallow up the rule." *Bowen*, 478 F.3d at 750. We have "made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)). The ALJ's failure to provide any reasons for ignoring Dr. Sekaran's 2011 opinion is reversible error.

### C. Substantial Evidence

The Appeals Council also tasked the ALJ with "giv[ing] further consideration to the claimant's maximum residual functional capacity and provid[ing] appropriate rationale with specific references to evidence of record in support of the assessed limitations." In finding that Wilson did not have a totally disabling impairment and had the residual functional capacity to perform sedentary work with some limitations, the ALJ relied on Dr. Rivero's testimony and the earlier ALJ decisions to discount Wilson's subjective complaints. Wilson argues that the ALJ improperly relied on Dr. Rivero's testimony and that the ALJ did not properly take into account her subjective complaints about her inability to work due to pain, her drowsiness due to medication side effects, and her difficulty sitting. We consider the record to determine whether the ALJ's conclusion was made pursuant to proper legal standards and is supported by substantial evidence.

### 1. Nonexamining Source Testimony

"Chief among [the Social Security Administration's governing standards] is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723; *see* 20 C.F.R. §§ 404.1512(b), 404.1513, 404.1520(a)(3). An ALJ may "consult a medical expert to gain more insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not inconsistent with other substantial evidence in the case record." SSR 96-2P, 1996 WL 374188, at *4 (July 2, 1996). "[B]ecause nonexamining sources have no examining or treating relationship with [the claimant]," the ALJ must "evaluate the degree to which these medical opinions consider all of the pertinent evidence in [the] claim, including medical opinions of treating and other examining sources." 20 C.F.R. § 404.1527(c)(3). The weight given to nonexamining sources "will depend on the degree to which they provide supporting explanations for their medical opinions." *Id.*

The ALJ used a consultative expert, Dr. Rivero, to provide more insight into Wilson's medical history. Dr. Rivero's testimony focuses on two aspects of the medical evidence: lack of records documenting Wilson's declining functional capacity before her insured period ended on March 31, 2011 and Dr. Bedia's November 2011 consultative examination. On the first point, Dr. Rivero testified that "some of these [doctors'] notes don't document the function, so it's difficult, but clearly there aren't real good notes prior to [20]12." But Dr. Rivero also made a series of determinations regarding Wilson's medical history. She testified that Wilson's fibromyalgia was "very severe" and "well documented in the record, with fatigue," and that Wilson "has the pretty well documented numbness and inability to do repetitive movement" and limits Wilson to "just occasional [handling and fingering], both hands."

Neither Dr. Rivero nor the ALJ addressed some other information in Wilson's medical history. Dr. Rivero does not mention Wilson's lower back pain due to diagnosed facet arthropathy or the positive bilateral median nerve compression and Tinel's tests, indicating carpal tunnel syndrome, from July and August 2010. Nor does she mention Wilson's numerous treatments before and just after March 31, 2011, such as steroid and lidocaine injections, intravenous lidocaine infusions, epidurals, acupuncture, individual pain management therapy, and use of medications such as Cymbalta and mexilitene for off-label purposes, with significant side effects.

The second point of Dr. Rivero's testimony is the evaluation of Dr. Bedia, a nontreating but examining source. In general, "an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination," but less weight than a treating source. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). If a treating source opinion is deemed not controlling, the ALJ weighs a nontreating source "based on the examining relationship (or lack thereof), specialization, consistency, and supportability," in

addition to other factors "'which tend to support or contradict the opinion.'" *Id.* at 376 (quoting 20 C.F.R. § 404.1527(c)(6)). Dr. Bedia reported negative Tinel's and Phalen's tests and found that Wilson had full finger-manipulation ability, suggesting no disabling carpal tunnel syndrome. He notes Wilson's normal gait and a finding of negative straight-leg raising (a test for back pain that does not rule out facet arthropathy), and that Wilson "can only go biking two miles or go up and down the stairs 10-15 minutes a day." Dr. Bedia does note that Wilson's pain is "in the entire back and also the hands," is not constant, is not relieved by pain medication, and is aggravated by "[b]ending over and prolonged sitting."

Only two observations in Dr. Bedia's evaluation belie other medical findings in the record. His negative Tinel's and Phalen's tests and finding that Wilson could manipulate her fingers contradict her doctors' findings of positive Tinel's and Phalen's tests and pain and numbness in Wilson's fingers and hands in July 2010, requiring wrist splints and, later, injections. Dr. Bedia's other observations in fact corroborate the assessments of Wilson's treating physicians. Finding that Wilson could bike a short distance and walk up and down stairs for only 10 to 15 minutes shows a limitation on Wilson's mobility that accords with the conclusions of her treating sources that Wilson could only stand, walk, or sit 1 to 3 hours each in a workday for short periods at a time. Dr. Bedia's findings relating to Wilson's stable gait, full range of motion in her joints, and ability to get on and off the examination table also do not contradict her treating physicians' assessments that she experienced pain and stiffness from sitting, standing, or walking for more than 30 or 45 minutes at a time. Nor does Dr. Rivero's recounting of Dr. Bedia's November 2011 examination respond to Wilson's treating physicians' assessments of the disabling effects of her conditions. Both the nontreating and nonexamining opinions are incomplete due to their limited

analysis of the effect and treatment of Wilson's fibromyalgia and carpal tunnel syndrome, as well as their lack of assessment of her facet arthropathy.

The ALJ did not address those gaps in her analysis. By failing to recognize how Dr. Bedia's assessment and Dr. Rivero's testimony ignored the treating source opinions and other aspects of the record, the ALJ has not met her obligation to "evaluate the degree to which these medical opinions consider all of the pertinent evidence in [the] claim, including medical opinions of treating and other examining sources." 20 C.F.R. § 404.1527(c)(3). The ALJ therefore violated agency regulations in attributing great weight to the nontreating and nonexamining sources, where those sources did not consider the treating source opinions or explain their supporting evidence. *See Gayheart*, 710 F.3d at 379 ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires.").

### 2. Subjective Complaints

Wilson argues that based on this limited review of the record, the ALJ did not have substantial evidence to give minimal weight to her subjective complaints of pain. When the symptoms, not the underlying condition, form the basis of the disability claim, the ALJ is to use a two-part analysis: first, ascertaining if there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms; and second, if such an impairment exists, evaluating the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *See* 20 C.F.R. § 404.1529(a). The ALJ must also "carefully consider any other information" submitted about a claimant's symptoms and will consider various factors in assessing a claimant's pain to determine her residual functional capacity. *Id.* § 404.1529(c)(3). These include the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and

aggravating factors; the type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; other types of treatments; other measures used to relieve pain or other symptoms; and other factors concerning functional limitations or restrictions. *Id.*; *see Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). "Limitations involving generalized pain may be 'severe enough to constitute disability.'" *Masters v. Comm'r of Soc. Sec.*, 707 F. App'x 374, 379 (6th Cir. 2017) (quoting *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984)). The ALJ cannot "reject [the claimant's] statements about the intensity and persistence of [the claimant's] pain or other symptoms or about the effect [these] symptoms have on [the] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. 404.1529(c)(2); *see also Gentry*, 741 F.3d at 726. Credibility determinations also "must be reasonable and supported by substantial evidence." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011).

Because the ALJ found that Wilson's medically determinable impairments could cause her reported symptoms, the issue before us is whether substantial evidence supported the ALJ's discounting of Wilson's statements about the intensity, persistence, and limiting effects of those symptoms.

Wilson has repeatedly testified to the limiting effects of fibromyalgia symptoms on her daily life. At her first hearing on January 26, 2012, closest in time to her last insured date of March 31, 2011, Wilson testified that her fibromyalgia results in "chronic back pains continuously," "pain in all the joints, stiffness in the neck," and "fatigue," as well as migraines. She described wearing wrist braces because when she uses her hands "on a regular basis or move them a lot, the pain shoots through [her] wrists and hands," particularly her two forefingers and thumb. Her lower back experienced a "stabbing pain" or "dull ache" or would "lock up" so she could not move at

all, and her lower extremities also experienced tension, tightness, and pain. She testified to feeling like she is "walking through life asleep" and either sleeping too much or too little. To mitigate the pain, she stretched "at least three to four times a day," used a heating pad, and took warm baths. Wilson also testified that her medications made her "feel lightheaded sometimes, a little loopy, . . . a little uneasy on [her] feet." In 2016, in her hearing before ALJ Paige, she rated her pain as an "eight" on a bad day on a one-to-ten scale and as a "four" on a good day, with a typical day at a "six" and three bad days a week. When she raises her hands, for a task such as fixing her hair, "anything over five minutes [her] hands hurt so bad . . . like they're on fire." Wilson testified that when she is standing, "anything over half an hour, [she] start[s] feeling pain, but [she] can stand probably an hour . . . but not without being in severe pain," and "[she] can sit for a while but this—again, the same thing." Her most comfortable position is leaning back with her feet elevated or lying down. She also reported being "so sleepy [she] can't function" due to taking the medications amitriptyline and cyclobenzaprine and was, at the time of the hearing, taking Robaxin and nortriptyline. Her daily activities are limited to stretching, taking her teenage children to their school located one mile away, using the microwave to prepare light meals, watching television, reading, helping her children with their homework, and taking them to various afterschool activities. Her children perform most of the cooking, housework, and yard work, though Wilson can load the dishwasher and occasionally go grocery shopping. Wilson testified that her inability to "do the things [she is] used to doing" led to her seek treatment for depression and anxiety.

The ALJ did not credit Wilson's testimony of "back and hand problems prior to March 2011 leading to crippling pain throughout her body" because they were "not corroborated by the record or the medical expert testimony." It is unclear whether the ALJ is referring to Wilson's

fibromyalgia or facet arthropathy when referencing her back problems. The ALJ did not consider testimony relating to pain in Wilson's lower extremities and migraines relating to fibromyalgia.

"[G]iven the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Kalmbach*, 409 F. App'x at 863 (quoting *Rogers*, 486 F.3d at 248). As justification, the ALJ cites to Dr. Rivero's testimony, again relying on Dr. Bedia's November 2011 consultative examination that found Wilson could ride a bicycle for two miles and walk with a stable gait and on the cursory statement that "any assessment disabling the claimant by March 2011 was not adequately corroborated by the record." The ALJ also cites to the testimony of nonexamining psychiatrist Dr. Rogell, who found "clinical reports from January 2011 establish that the claimant was diagnosed with an adjustment disorder with depression and anxiety secondary to chronic pain from fibromyalgia," but that her psychiatric limitations were only "mild" and would not severely restrict her ability to work. The ALJ then simply incorporates the 2012 and 2014 opinions for their discussion of medical exhibits prior to March 2011.

We do not find these justifications to provide substantial evidence to discount Wilson's testimony for several reasons. First, simply because Wilson can bike for two miles, walk for 15 minutes, and drive one mile to her children's school does not indicate she can perform eight hours of work activities. *See Kalmbach*, 509 F. App'x at 864 (finding that a claimant's ability to perform light daily activities does not justify discrediting her testimony regarding her severe fibromyalgia symptoms); *Rogers*, 486 F.3d at 248–49 (same). Second, Dr. Rogell's review of Wilson's psychiatric history and symptoms in fact supports Wilson's testimony that she experienced depression incident to her pain and decreased capacity. Third, the discussions of medical exhibits in the 2012 and 2014 decisions are flawed—they do not analyze the treating source opinions but

overemphasize the evaluating psychiatrist Dr. Dibai's finding that Wilson may have fabricated her symptoms. In fact, Dr. Rogell testified that a diagnosis of factitious disorder was not supported by the record. Fourth, as discussed above, because the ALJ violated agency regulations by giving unexplained weight to Dr. Rivero's and Dr. Bedia's opinions over the treating source opinions, the ALJ's decision to reject Wilson's subjective complaints is similarly unsupported. *See Cole*, 661 F.3d at 937 ("An ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."). Fifth, the ALJ appears to have "cherry-picked select portions of the medical record to discredit [the claimant's] complaints of pain." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013). Considerable evidence of Wilson's fibromyalgia-related pain prior to March 31, 2011 was not mentioned by Dr. Rivero or Dr. Bedia. Wilson had seen numerous doctors for pain in her back, hands, and other parts of her body and tried numerous medications and invasive pain-relieving treatments, as described by Dr. Harris, Dr. Sekaran, and other physicians.

Other objective evidence in the record supports Wilson's subjective complaint of pain. The Appeals Council remand specified that the ALJ consider the positive Tinel's test in Dr. Harris's 2010 medical assessment report, showing an objective diagnosis of carpal tunnel syndrome that reinforces Wilson's testimony of finger and wrist pain and numbness. There is no reference to this positive Tinel's test in the 2017 ALJ decision. Dr. Rivero's testimony, on which the ALJ relies, also does not refer to Wilson's positive Tinel's and Phalen's tests in July 2010 or the positive Tinel's test from Dr. Harris in August 2010. The 2012 decision that the ALJ incorporated by reference does mention the positive Tinel's and Phalen's tests but does not evaluate them using the treating physician rule, merely concluding that there is not enough support for a diagnosis of

carpal tunnel syndrome. The ALJ failed to explain her disregard for Dr. Harris's positive Tinel's test for Wilson's carpal tunnel syndrome, even though it was specified for remand consideration.

Wilson also argues that the ALJ incorrectly found that her "argument of drowsy side effects from her medications is also not substantiated by the close of her coverage." The side effects of any medication taken to alleviate pain or other symptoms are relevant to determining the extent to which a claimant's pain and other symptoms limit her capacity for work. 20 C.F.R. § 404.1529(c). The record contains several doctors' notes confirming Wilson's drowsiness before the expiration of her insured status in March 2011 based on the side effects of taking Cymbalta. The Commissioner argues that because Wilson testified that her drowsiness was caused by two other drugs associated with depression and muscle spasms (and failed to reference Cymbalta), that the ALJ had substantial evidence to conclude that Wilson's complaint of drowsiness did not correspond with the medical record. But Wilson is not a doctor, and she was responding to questions about her medications at the time of the hearing in 2016; the relevant inquiry is whether Wilson's pain-relieving medications limited her capacity to work before the expiration of coverage in March 2011. There is no evidence in the record contradicting the doctors' notes about Wilson's somnolence caused by Cymbalta during that period. The ALJ did not have substantial evidence in the record to reject Wilson's complaint of the side effects of drowsiness.

Lastly, Wilson disagrees with the ALJ's use of Wilson's statement "that she was able to sit for a while" to discredit Wilson's subjective complaints of pain. In response to the ALJ's questions about how long she could stand, Wilson testified that she started feeling pain after standing for half an hour and would experience severe pain if she stood for an hour; she continued that she could "sit for a while" but would experience similar pain when sitting as when standing. This testimony does not contradict Wilson's other statements that she experienced constant fatigue and

near-continuous pain all over her body. Nor does it contradict medical evidence that Wilson cannot sit for longer, continuous periods, as is sometimes required for full-time employment. As Dr. Harris and Dr. Sekaran opined, she could sit for 30 or 45 minutes at one time, but she required frequent unscheduled breaks of 30 minutes to an hour between sitting periods.

By not fully considering Wilson's subjective claims of pain, the ALJ failed to follow remand instructions and fulfill her obligation to look at the record as a whole. The ALJ discounted Wilson's subjective complaints based on several legal errors—failing to consider Dr. Sekaran's 2011 assessment as a treating source opinion; failing to evaluate the degree to which Dr. Rivero's testimony relied primarily on Dr. Bedia's consultative evaluation rather than on the entire record ; and failing to address the positive Tinel's test as directed by remand order. The legal errors are not harmless because "they effectively resulted in the ALJ's disregard of a substantial body of medical evidence supporting a finding that [the claimant] is disabled." *Gentry*, 741 F.3d at 729; *see also Cole*, 661 F.3d at 939–40. Additionally, the ALJ's observations about Wilson's drowsiness and ability to sit are not supported by substantial evidence. Such errors, when viewed in light of the evidence on the record as a whole, persuade us to reverse the decision to deny disability insurance benefits.

## III. CONCLUSION

"We have authority to affirm, modify, or reverse the Commissioner's decision 'with or without remanding the cause for rehearing.'" *Minor*, 513 F. App'x at 438 (quoting 42 U.S.C. § 405(g)); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). "Benefits may be awarded immediately if all essential factual issues have been resolved, 'the proof of disability is strong, and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.'" *Minor*, 513 F. App'x at 438 (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

Wilson has presented strong proof of disability. Under the framework for Social Security disability determinations at 20 C.F.R. § 404.1520(a)-(f), Wilson has met the first three steps of the five-step sequential analysis: she met insured status requirements through March 31, 2011, she has not engaged in substantial gainful activity since the alleged onset date in March 2004, and she had the severe impairments of fibromyalgia, carpal tunnel syndrome, and facet arthropathy through the date last insured, though her impairments are not so severe that we end the analysis at step three. *See id.*

At step four, Wilson does not have the residual functional capacity to perform her past relevant work as a mail handler, but we consider whether her residual functional capacity, age, education, and past experience permit her to do other work. *See id.* § 404.1520(g). Dr. Harris and Dr. Sekaran, her treating physicians, found her residual functional capacity to be severely restricted with regard to sitting, standing, handling, fingering, requiring long and frequent breaks, and needing four or more extra days off of work each month. Those restrictions are supported by the medical notes in the record before March 31, 2011, her date last insured. Wilson's diagnoses, treatments, and subjective complaints indicate that Wilson has significant, disabling impairments before the expiration of her disability insurance coverage.

Finally, at step five, "the Commissioner must make a finding 'supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs'" which may be shown through the testimony of a vocational witness in response to a hypothetical question which accurately portrays the claimant's "'individual physical and mental impairments.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). The vocational expert Cynowa, in response to a question by the ALJ about hypothetical restrictions of 45-minute breaks every 30 minutes and/or

missing four or more days of work each month due to her disability, said that a claimant would not be able to keep any full-time employment with those restrictions. Cynowa's testimony establishes that, with the restrictions recommended by Wilson's treating physicians and substantiated by Wilson's medical records and her subjective complaints, by March 2011, Wilson could not perform any full-time work in the national economy.[6]

In light of the opinions of the treating physicians, the medical record, and Wilson's corroborated assertions of pain and side effects from her medications, we conclude that evidence of her total disability, based on the record as a whole, is strong, and the proof to the contrary offered by nontreating and nonexamining physicians lacks substance. *Minor*, 513 App'x at 438–39.

There is, however, one remaining question: the exact onset date of her disability. There is no objective evidence that Wilson's disability began on July 1, 2004, her alleged onset date, and neither Wilson nor the Commissioner has provided guidance as to a different established onset date. Based solely on the record before us, it is difficult to determine an established onset date; further testimony is appropriate. *See* SSR 83–20, 1983 WL 31249, at *1.

Accordingly, for the reasons stated above, we **REVERSE** and **REMAND** to the district court to remand the case to the Commissioner for the limited purpose of determining the onset date of Wilson's disability and granting an award of benefits as of the onset date.

---

[6] We therefore need not reach Wilson's argument that security monitor jobs are obsolete.